2003 WY 12

**Jason Christopher HART, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 01–22.

Supreme Court of Wyoming.

Jan. 28, 2003.

---

Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; Tina N. Kerin, Assistant Appellate Counsel, Representing Appellant. Argument by Ms. Kerin.

Hoke MacMillan, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Jay Jerde, Senior Assistant Attorney General, Representing Appellee. Argument by Mr. Jerde.

Before HILL, C.J., and GOLDEN, LEHMAN *, KITE and VOIGT, JJ.

GOLDEN, Justice.

[¶ 1] A Sheridan County jury found appellant Jason Hart (Hart) guilty of aggravated assault and battery for threatening to use a drawn deadly weapon on his former father in-law. After reviewing the record, we find sufficient evidence to support the conviction and also conclude the prosecutor did not commit reversible misconduct in closing argument. In addition, we find no reversible error as a result of the actions of Hart's former attorney, who "switched sides" and was employed by the prosecuting attorney's office at the time of trial. However, as detailed below, in future cases involving an attorney who switches sides, a prosecuting attorney's office must do much more than was done in this case to establish, on the record, that the attorney in question was properly screened from the prosecution of the former client.

[¶ 2] We affirm.

## ISSUES

[¶ 3] Hart and the State present these issues:

I. Was the evidence sufficient to convict appellant of aggravated assault?

II. Did the prosecution violate Wyoming Rule of Professional Conduct 1.9 by not disqualifying its office from the prosecution of appellant, and by allowing appellant's prior attorney to be present and participate in appellant's prosecution?

III. Did the prosecutor commit prosecutorial misconduct in closing argument?

## FACTS

[¶ 4] Hart and Natalie Moline divorced in January of 1996. After their divorce, they maintained an "on-again/off-again" relationship. In February of 1998, a son was born of their union. Sometime in late January of 2000, Ms. Moline informed Hart that their relationship was over. According to Ms. Moline, Hart became very upset as a result. The situation reached a head on January 29, 2000.

[¶ 5] During the late afternoon of that day, Hart called Ms. Moline several times. Scared by the phone calls, Ms. Moline left her home and drove to her parents' home. After speaking with her parents and being assured that her son was safely in the care of Hart's parents, Ms. Moline decided to return to her home. As she left her parents' home, she observed Hart approaching in his pickup truck. Ms. Moline ran back inside her parents' house and called 911. In the meantime, Hart parked his vehicle across the street from the Moline home and exited his vehicle.

[¶ 6] As Hart walked toward the Moline home, Ms. Moline observed Hart tuck a handgun into the back waistband of his

pants. Informed that Hart was approaching with a gun, Richard Moline, Ms. Moline's father, went to the front door of the home to lock and secure the door. Hart opened the outer screen door and demanded to be let in. He told Mr. Moline: "Dick, you better let me in." Mr. Moline responded by telling Hart to go home and either cool off or settle down. Hart then pulled the gun out of the back of his pants and showed it to Mr. Moline by holding it straight up in the air, pointing toward the sky, directly in front of a window. Hart then beat on the Molines' front door. When it became apparent he would not gain entry, Hart left. As he walked to his pickup truck, Hart stopped and shot four rounds into Ms. Moline's pickup truck. He then drove off.

[¶ 7] Hart was apprehended within minutes of the incident and arrested. He was later charged with aggravated assault under Wyo. Stat. Ann. § 6–2–502(a)(iii). A two-day jury trial resulted in a guilty verdict, and this timely appeal followed.

## DISCUSSION

### A. Sufficiency of the Evidence

[¶ 8] Hart contends the State presented insufficient evidence to establish, beyond a reasonable doubt, that he threatened to use a drawn deadly weapon. Our standard for reviewing such a claim is well established.

> When reviewing a sufficiency of the evidence claim in a criminal case, we must determine whether a rational trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt. *Jennings v. State*, 806 P.2d 1299, 1302 (Wyo.1991) (quoting *Munson v. State*, 770 P.2d 1093, 1095 (Wyo.1989)). We do not consider conflicting evidence presented by the unsuccessful party, and afford every favorable inference which may be reasonably and fairly drawn from the successful party's evidence. *Bloomquist v. State*, 914 P.2d 812, 824 (Wyo.1996). We have consistently held that it is the jury's responsibility to resolve conflicts in the evidence. *Id.* (citing *Wetherelt v. State*, 864 P.2d 449, 452 (Wyo.1993)). "We will not substitute our

judgment for that of the jury, . . . our only duty is to determine whether a quorum of reasonable and rational individuals would, or even could, have come to the same result as the jury actually did." *Id.* (citing *Hodges v. State*, 904 P.2d 334, 339 (Wyo. 1995)).

*Williams v. State*, 986 P.2d 855, 857 (Wyo. 1999).

[¶ 9] Hart was convicted of violating Wyo. Stat. Ann. § 6–2–502(a)(iii) (LexisNexis 2001), which provides in pertinent part:

> (a) A person is guilty of aggravated assault and battery if he:
> \* \* \* \*
> (iii) Threatens to use a drawn deadly weapon on another unless reasonably necessary in defense of his person, property or abode or to prevent serious bodily injury to another[.]

In interpreting this statutory language, this Court has held

> that the phrase "threatens to use" in § 6–2–502(a)(iii) . . . requires proof of an actual threat of physical injury during the act of employing a deadly weapon. [Thus, it] was error for the trial judge to insinuate in his answer to the question that factual circumstances would govern in determining if the (mere) presence of a weapon in hand could constitute a threat to use. It cannot. Proof of a required ingredient of an element of a criminal offense to be proved beyond a reasonable doubt cannot be aided by such an inference, presumption or insinuation of the kind contained in the trial court's reply.

*Johnston v. State*, 747 P.2d 1132, 1134 (Wyo. 1987).

[¶ 10] Applying these principles to this case, we find adequate evidence to sustain Hart's conviction. Viewed in a light most favorable to the State, the facts show that Hart went to the front door of the Molines' home and told Mr. Moline, "you better let me in." To reinforce this demand, Hart held up his handgun for Mr. Moline to see. Clearly, this is more than mere presence of a weapon in Hart's hand. Instead, given Hart's demands and his display of a deadly weapon to the man resisting the de-

mands, we are satisfied that a jury could rationally conclude that Hart made an actual threat to use a drawn deadly weapon on Mr. Moline. We thus conclude there was sufficient evidence to support the conviction.

## B. Prosecutorial Misconduct

[¶ 11] Hart next contends that the prosecutor committed misconduct in closing argument. Hart points to two remarks, one from the prosecutor's closing argument, the other from the prosecutor's rebuttal closing. In his brief, Hart quotes the first challenged remark:

This whole thing about the Defendant intending to kill himself has been a false issue that's just been kind of floating around out there throughout. What the Defendant's actions were all about weren't about suicide. * * * *

But the bottom line is it doesn't really matter what his intention was, whether he was intending at that time to kill himself. What matters is that he committed an aggravated assault.

■ [¶ 12] Appellant contends the prosecutor's remark was a gross misstatement of the law because intent does matter, even if the crime is a general intent crime. *See Cox v. State,* 829 P.2d 1183, 1185–86 (Wyo.1992) (holding that Wyo. Stat. Ann. § 6–2–502(a)(iii) defines a general intent crime); *accord Streitmatter v. State,* 981 P.2d 921, 923–24 (Wyo.1999). However, when viewed in context, we find no error in this remark. Instead, we find the prosecutor was imploring the jury to focus on Hart's intent with respect to his actions at the Molines' front door, not Hart's purported intent to commit suicide. Indeed, defense counsel, in opening statement, importuned that Hart's intent when leaving his home, with three firearms, was to commit suicide. In addition, one of the arresting officers testified that Hart stated he intended to kill himself. Thus, because Hart's suicidal ideation was a factual issue before the jury, the prosecutor was free to direct the jury's focus with respect to those

facts. We find no error in the prosecutor's remarks that Hart's suicidal ideation was not the issue. Such an argument was well within the permissible scope of a prosecutor's argument, as set out in *Trujillo v. State,* 2002 WY 51, ¶ 5, 44 P.3d 22, ¶ 5 (Wyo.2002).

[¶ 13] The second challenged remark came as the prosecutor finished his rebuttal argument. There, the prosecutor stated:

I trust that you'll follow your oath and return a finding of guilty against the Defendant.[1]

[¶ 14] Recently, in *Wilks v. State,* 2002 WY 100, ¶ 28, 49 P.3d 975, ¶ 28 (Wyo.2002), we addressed Wilks' challenge to the following comment from the prosecutor: "Do your duty, please, and find the Defendant guilty of First Degree Murder." There, we wrote:

"Generally, an exhortation to the jury to 'do the right thing,' to 'do your job,' or to 'do your duty' is error if it 'implies that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court's instructions on the law.' " *Jackson v. State,* 791 So.2d 979, 1029 (Ala.Crim.App.2000), *cert. denied,* 532 U.S. 934, 121 S.Ct. 1387, 149 L.Ed.2d 311 (2001) (quoting *Arthur v. State,* 575 So.2d 1165, 1185 (Ala.Crim.App. 1990)). Such a statement may also run afoul of the admonition against injecting issues broader than the guilt or innocence of the accused. See [I A.B.A.] Standards for Criminal Justice 3–5.8(d) [2d ed.1980].

*Wilks,* ¶ 28.

■ [¶ 15] Applying those principles to this case, we find no error. Clearly, the prosecutor did not expressly tell the jury that, in order to perform its duty, it must return a guilty verdict. In addition, after a careful review of the prosecutor's entire closing statement, we find the prosecutor did not make such an implication, either. Instead, the comment in question followed the prosecutor's exhortation to the jury that it should review all of the evidence in reaching its decision. Thus, while we will continue to

---

1. Although not mentioned by Hart, the prosecutor, at the end of his opening statement, also made a similar remark: "And in accordance with the instructions that [the district court judge] will give you at the end of the trial, we'll call upon you to do your duty under the law and return a finding of guilty against the Defendant."

review these sorts of comments with a careful and, where appropriate, jaundiced eye, we find no error in this or any similar comment made by the prosecutor.

## C. Conflict of Interest

[¶ 16] Here, Hart claims the county attorney's continued representation of the State after Hart's original attorney "switched sides" violates the Rules of Professional Conduct and necessitates a new trial wherein the county attorney's office would be disqualified from prosecuting Hart. The facts relevant to this claim are these. On February 2, 2000, the attorney in question, Ms. Bennett, while employed as a public defender, was appointed to represent Hart in this matter. Ms. Bennett represented Hart at arraignment, where Hart pled not guilty, and for some time thereafter. The record does not include any order allowing Ms. Bennett to withdraw from this case. However, the record does reveal that substitute counsel entered an appearance, at the latest, on June 20, 2000.

■ [¶ 17] Clearly, due to her representation of Hart in the very same case, Ms. Bennett was disqualified from involvement in the state's prosecution of Hart. *State v. Cline*, 122 R.I. 297, 405 A.2d 1192, 1207 (1979) ("There is no doubt that an attorney who has represented a defendant may not serve as his prosecutor."). *See also*, Rules of Professional Conduct for Attorneys at Law 1.11(c)(1). It is also clear from the record that Ms. Bennett did not appear in court on behalf of the State in the prosecution against Hart.[2] Thus, the question is whether the entire prosecutor's office was disqualified from prosecuting Hart because one of its associates, Ms. Bennett, had previously represented Hart in the same matter.

[¶ 18] We recently addressed a similar claim in *Blumhagen v. State*, 11 P.3d 889 (Wyo.2000). There we wrote:

Blumhagen contends that the district attorney's office's continued representation of the state after his original attorney "switched sides" violated the Rules of Professional Conduct for Attorneys at Law. In general, the rules of professional conduct prohibit attorneys from representing clients when there is a potential conflict of interest. *See, e.g.,* Rules of Professional Conduct for Attorneys at Law 1.7, 1.9, 1.10, 1.11, 1.12. Nevertheless, the rules recognize that attorneys change employment and, consequently, include a number of safeguards to protect the clients' interests under such circumstances. For example, when an attorney who works for a governmental agency leaves his employment and enters private practice or takes a position with another governmental agency, he cannot be involved in a matter that he participated in with his first employer. Rules of Professional Conduct for Attorneys at Law 1.11 & cmt. [4]. Other attorneys associated with the disqualified attorney's new employer may, however, undertake or continue representation in a matter that the transferring attorney is prohibited from being involved with, provided that "the disqualified lawyer is screened from any participation in the matter" and notice is given to the former employer. Rules of Professional Conduct for Attorneys at Law 1.11(a). The evidence in this case shows that the district attorney's office complied with the requirements of Rule 1.11(a) by screening Blumhagen's former attorney from participation in the matter and giving notice to the public defender's office. Additionally, Blumhagen has not shown that his defense was prejudiced, or even affected, by the attorney's change of employment.

*Id.* at 896–97.

[¶ 19] Even more recently, in *Johnson v. State*, 2003 WY 9, 61 P.3d 1234, we ad-

---

**2.** Although Ms. Bennett was present at a change of plea hearing involving Hart, her presence there does not suggest that she was participating in the prosecution of Hart. Whether she attended the hearing as a spectator or was simply waiting for her turn on some other matter, Ms. Bennett did not, at that hearing, participate in the prose-

cution of Hart. Instead, taking advantage of knowledge Ms. Bennett had gained from having been on "both sides of the fence," the district court drew Ms. Bennett into the proceeding by asking for her assistance in locating some extradition forms.

dressed another case where an attorney had switched sides. We wrote:

> As the first step in providing guidance to trial courts in handling such a question, we will adopt the standard that a trial court has substantial latitude in deciding if counsel must be disqualified. *See United States v. Frega,* 179 F.3d 793, 799 (9th Cir.1999) *(citing United States v. Stites,* 56 F.3d 1020, 1024 (9th Cir.1995)). We decline to adopt an "appearance of impropriety" standard and adopt instead a "function approach," which focuses on preserving confidentiality and avoiding positions adverse to the client. *See State v. Dimaplas,* 267 Kan. 65, 978 P.2d 891, 893–94 (1999). We are persuaded that much more needs to be done in future cases where such a conflict as that identified above arises, but we will set down no bright-line rules. Utilizing the standards adopted above, we hold that Johnson was not substantially prejudiced by the Natrona County district attorney's handling of adding Brown [Johnson's former attorney] to his staff, however ill-considered it might appear on the surface. We are satisfied that Brown's testimony was frank and direct and that his personal efforts to ensure that no prejudice would result to his former client outbalance any lack of attention to this vital issue. From the case, *Matter of R.B.,* 583 N.W.2d 839, 841–42 (S.D.1998), we have distilled the following additional guidelines, which must be followed in future cases:

> 1. Oral and written directions must be given to all staff members that the attorney will not participate in any matter in which the attorney participated as a public defender or criminal defense attorney. A written screening policy must be put in place to ensure this requirement is met.

> 2. A letter should be directed to every former client of the attorney announcing the new employment relationship. This letter may be sent to the client, care of the client's current attorney. Ideally, this letter should appear in the court record of an affected criminal case.

> 3. The prosecuting attorney's screening policy should be sent to every judge in the district, circuit, and/or county affected.

> 4. A copy of the screening policy should be placed in every active case file in which the attorney participated.

> 5. All office employees should be advised both orally and in writing that any violation of the screening process must be reported immediately and that inattention to the screening policy will result in discipline.

> 6. In a prominent location near case files, post a list of all cases from which the attorney is to be screened.

> These, or comparable procedures, should remain in place until the need for them has passed.

> In addition, prosecuting attorneys should be familiar, or as necessary become familiar, with applicable ABA standards relating to the prosecution function, as well as with pertinent case law, as may be required by circumstances such as those which arose here. Ignorance of the law is no less a defense for a prosecuting attorney than it is for a criminal defendant. *Id.,* ¶¶ 19, 20, 21.

[¶ 20] Despite filing his brief following publication of our decision in *Blumhagen,* Hart suggests that this Court should adopt a rule of per se disqualification, *i.e.,* that the prosecuting attorney's office should be disqualified in every case involving an attorney who switches sides. However, it is implicit from *Blumhagen,* as well as the later *Johnson* case, that this Court has eschewed such an approach. Thus, this Court will continue to follow the majority of jurisdictions that reject the per se rule of disqualification, and we will continue to look at each case on its facts. *Johnson,* ¶ 19; *State v. McKibben,* 239 Kan. 574, 722 P.2d 518, 526 (1986) ("We choose to follow the majority of jurisdictions and reject the per se rule of disqualification."); *Young v. State,* 297 Md. 286, 465 A.2d 1149, 1152–54 (1983); Wayne R. LaFave et al., *Criminal Procedure* § 22.5(d), at 357–58 (2nd ed.1999); *see also* Rules of Professional Conduct for Attorneys at Law 1.11 cmt. 8 ("Paragraph (c) does not disqualify

other lawyers in the agency with which the lawyer in question has become associated.").

[¶ 21] Turning to the facts in this case, unlike *Blumhagen* and *Johnson,* there is no evidence in the record that the county attorney's office employed screening procedures. Hart contends this Court should presume that Ms. Bennett communicated confidential information to members of the county attorney's office. Before getting to that question, Hart is correct that it is irrebuttably presumed that, during the course of Ms. Bennett's representation of Hart in this matter, Hart shared confidential information with Ms. Bennett. In *Carlson v. Langdon,* 751 P.2d 344, 348–49 (Wyo.1988), this Court, in interpreting Rule 1.9 of the Rules of Professional Conduct, wrote:

> In its ruling, the trial court further indicated that disqualification was not required because, even if it assumed the existence of the attorney-client relationship, there was nothing to show that any confidential information had been communicated. Rule 1.9, W.R.P.C., and the cases out of which it evolved, do not require any showing of disclosure of confidential information. The correct interpretation is that the communication of confidential information is presumed once a showing is made that the matter in which an attorney formerly provided representation is substantially related to matters in the pending action.
>
> * * * *
>
> The majority rule is that the presumption of disclosure is not rebuttable when the interests of the previous client are adverse to a client whom the attorney now is representing.* * * * We adopt the rule of irrebuttable presumption* * *.

[¶ 22] While this irrebuttable presumption is part of the reason that Ms. Bennett is not permitted to participate in prosecuting Hart, the more difficult question is whether there should also be a second stage presumption, *i.e.,* a presumption that Ms. Bennett communicated confidential information to other members of the county attorney's office. *See id.* at 348. In *Carlson,* this Court wrote, "while that is not this case, we would not adopt a second-stage irrebuttable presumption in cases involving imputed knowl-

edge." *Id.* at 349. While it could be argued that, by implication, *Carlson* establishes a second stage presumption, *i.e.,* that Ms. Bennett is presumed to have shared confidential information with members of the county attorney's office, it must be remembered that *Carlson* generally dealt with civil matters involving private attorneys.

[¶ 23] "There is, of course, quite a difference in the relationship between law partners and associates in private law firms and lawyers representing the government." *United States v. Caggiano,* 660 F.2d 184, 190 (6th Cir.1981). In reversing a decision disqualifying an entire United States Attorney's Office, the Sixth Circuit Court of Appeals reasoned:

> The relationships among lawyers within a government agency are different from those among partners and associates of a law firm. The salaried government employee does not have the financial interest in the success of departmental representation that is inherent in private practice. The important difference in the adversary posture of the government lawyer is recognized by Canon 7: the duty of the public prosecutor to seek justice, not merely to convict, and the duty of all government lawyers to seek just results rather than the result desired by a client. The channeling of advocacy toward a just result as opposed to vindication of a particular claim lessens the temptation to circumvent the disciplinary rules through the action of associates.

*Id.* at 191 (quoting Formal Opinion 342, 62 A.B.A.J. 517 (1976) of ABA Committee on Professional Ethics). Based on this reasoning, and taking into account Ms. Bennett's continuing duty to preserve client confidences, we see no reason, in this particular case, to employ a rule that presumes that Ms. Bennett shared confidential information with the prosecuting attorney's office. *See also,* Rules of Professional Conduct for Attorneys at Law 1.9 cmt. 7 ("Independent of the question of disqualification of a firm, a lawyer changing professional association has a continuing duty to preserve confidentiality of information about a client formerly represented.").

[¶ 24] In addition to Ms. Bennett's duty to preserve client confidences, other pragmatic reasons support this decision under these particular facts. Hart's trial counsel replaced Ms. Bennett and later appeared at the change of plea hearing where it was apparent that Ms. Bennett was employed by the county attorney's office. Obviously, defense counsel was aware that Ms. Bennett had switched sides. If defense counsel believed there was any impropriety in the switching of sides, we believe counsel would have lodged an objection. Counsel, in his discretion, did not do so. Thus, we conclude that defense counsel did not believe there was any impropriety in Ms. Bennett's actions. Under these limited circumstances, we find no error. However, in the future, as discussed above, the prosecuting attorney's office must make a showing, on the record, that the attorney who switched sides was screened from the prosecution of the former client.

[¶ 25] We find no legal error in the proceedings and therefore affirm.