2004 WY 111

**William J. LAW, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 03–4.

Supreme Court of Wyoming.

Sept. 24, 2004.

Representing Appellant: Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel. Argument by Ms. Domonkos.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Theodore E. Lauer, Director, and Brandon N. Delozier, Student Intern, of the Prosecution Assistance Program. Argument by Mr. Delozier.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

GOLDEN, Justice.

[¶ 1] After a jury trial, William J. Law was convicted of stalking in violation of Wyo. Stat. Ann. § 6–2–506(e)(iii) (LexisNexis 2004).[1] On appeal, Law challenges the admission of a knife into evidence and claims that certain remarks made by the prosecutor in voir dire and closing constituted prosecutorial misconduct requiring reversal. Finding no reversible error, we affirm.

## ISSUES

[¶ 2] Law presents two issues [2] for review by this Court:

1. Whether the trial court committed reversible error when it admitted evidence which was irrelevant and highly prejudicial.

2. Whether prosecutorial misconduct occurred when the state argued for the jury to convict Mr. Law for reasons other than the evidence and when the state preconditioned the jury during voir dire.

The State essentially agrees with the phrasing of the issues.

## FACTS

[¶ 3] In 1994, Law married AC, and the couple had a son. The marriage was rocky, and the couple divorced in 1998. The couple attempted a reconciliation, and Law moved back in with AC in 1999. AC accepted a job offer in Cheyenne as a civilian employee at Warren Air Force Base. The couple moved to Cheyenne in 2000, continuing to live together in a house owned solely by AC.

[¶ 4] In May 2001, Law pled guilty to child endangerment for striking Adam. Law was placed on probation for one year. The relationship continued to deteriorate and in September 2001, AC wrote a letter to Law

1. § 6–2–506. Stalking; penalty.

(a) As used in this section:
   (i) "Course of conduct" means a pattern of conduct composed of a series of acts over any period of time evidencing a continuity of purpose;
   (ii) "Harass" means to engage in a course of conduct, including but not limited to verbal threats, written threats, vandalism or nonconsensual physical contact, directed at a specific person or the family of a specific person, which the defendant knew or should have known would cause a reasonable person to suffer substantial emotional distress, and which does in fact seriously alarm the person toward whom it is directed.

(b) Unless otherwise provided by law, a person commits the crime of stalking if, with intent to harass another person, the person engages in a course of conduct reasonably likely to harass that person, including but not limited to any combination of the following:
   (i) Communicating, anonymously or otherwise, or causing a communication with another person by verbal, electronic, mechanical, telegraphic, telephonic or written means in a manner that harasses;
   (ii) Following a person, other than within the residence of the defendant;
   (iii) Placing a person under surveillance by remaining present outside his or her school, place of employment, vehicle, other place occupied by the person, or residence other than the residence of the defendant; or
   (iv) Otherwise engaging in a course of conduct that harasses another person.

(c) This section does not apply to an otherwise lawful demonstration, assembly or picketing.

(d) Except as provided under subsection (e) of this section, stalking is a misdemeanor punishable by imprisonment for not more than six (6) months, a fine of not more than seven hundred fifty dollars ($750.00), or both.

(e) A person convicted of stalking under subsection (b) of this section is guilty of felony stalking punishable by imprisonment for not more than ten (10) years, if:
   (i) The act or acts leading to the conviction occurred within five (5) years of a prior conviction under this subsection, or under subsection (b) of this section, or under a substantially similar law of another jurisdiction;
   (ii) The defendant caused serious bodily harm to the victim or another person in conjunction with committing the offense of stalking;
   (iii) The defendant committed the offense of stalking in violation of any condition of probation, parole or bail; or
   (iv) The defendant committed the offense of stalking in violation of a temporary or permanent order of protection issued pursuant to W.S. 7–3–508 or 7–3–509, or pursuant to a substantially similar law of another jurisdiction.

2. Law originally included a third issue. The trial transcript reflected that the alternate juror was present during jury deliberations and voted on the ultimate issue of guilt. After Law submitted his appellate brief, the court reporter submitted an affidavit stating the record was in error and the alternate juror was released prior to jury deliberations. At oral argument Law conceded the issue.

essentially telling Law to move out of her house by the end of the year. Law did not move out of the house by the end of December. In early January 2002, AC found an envelope on the window of her car when she was leaving her workplace on the base. In the envelope were a couple of newspaper articles: one on children generally and the other a horoscope to the effect that AC needed to pay attention to someone she was neglecting. AC assumed Law placed the envelope on her window because Law, as a veteran, had full access to the base. AC contacted an attorney who sent Law a Notice to Quit, essentially evicting Law from AC's house. Law finally moved out of the house on January 11, 2002.

[¶ 5] A few days after Law moved out, AC began receiving hang up phone calls from pay phones around town. AC and her neighbors saw Law drive by her house frequently, usually in the mornings. AC set up a camera in her front window to record passing cars, but the camera could only record the general make, model, and color of the cars. It could not capture the license plate number or the identity of the driver. On January 25, 2002, a message was left on AC's voice mail that was too garbled to understand. On February 14, 2002, Law went to a neighbor's house and left flowers for the neighbor to give to AC. In March, Law gave flowers to their son, to give to AC. AC saw Law driving through her neighborhood a few days later. AC spoke to Law that evening and told him to leave her alone. She did not want him to contact her either directly or through their son. Law wanted to continue the conversation and left repeated messages on AC's home phone and work phone. AC contacted the safe house for information on how to obtain a stalking protection order. On March 22, 2002, AC filed for a stalking protection order in circuit court. On March 29, the proceeding resulted in a mutually agreed upon no-contact order, restricting Law from contacting AC or driving on certain streets in her neighborhood.

[¶ 6] On March 30, AC drove her son down to Denver where he boarded a flight to San Antonio to spend time with his maternal grandmother. Later that same evening, after AC returned to Cheyenne, AC went out to a local club. Law walked in, saw her and walked out. On April 1, AC awoke to find her phones did not work. She went outside and discovered that the box containing the telephone lines had been opened and her phone lines disconnected. On April 2, AC attempted to fill up the gas tank on her car and discovered a foreign substance, presumably ceiling tile material, jammed into the gas tank. On April 3, AC went out to the Outlaw Saloon. Upon her return home she discovered a garbled message on her voice mail. She was able to make out the message. It essentially suggested that she should not be hanging out in bars and such activity would be used against her in a custody dispute over their son. Despite being garbled, AC testified that she was one hundred percent certain the message was from Law. After discovering the message, AC went out to her car to see if the gas tank had been tampered with and discovered the remains of a package of sugar and a package of Sweet 'N Low in the tank.

[¶ 7] After each of the incidents described in the prior paragraph, AC contacted law enforcement. Initially, law enforcement found no proof that Law was involved. AC declined an offer by law enforcement that they speak to Law, fearing that an approach by law enforcement would only escalate Law's alleged stalking behavior. Because law enforcement could not offer much help under the circumstances, AC decided to hire private security. She contacted David Lopez, a private investigator, and Mark Thayer, the owner of Century Security Services. As it happened, AC had meetings with both men scheduled at her house for the early evening of April 4, 2002. Lopez arrived first, and then Thayer arrived around 6:00 in the evening. Lopez had finished his meeting with AC and was just leaving. Within a few minutes of Lopez having left the house, Lopez called and told AC that he thought he saw Law's car parked a few blocks from her house. AC confirmed the license plate number to Law's car. Thayer left AC's house to drive around and look for Law in the neighborhood. AC then received information from her next-door neighbor that the neighbor had

seen Law running down an alley in the neighborhood.

[¶ 8] Thayer spotted Law walking down a sidewalk a few blocks from AC's house. When Law spotted Thayer, he crouched down behind a pickup truck and stayed there until Thayer passed. Thayer left the area because he knew he had been spotted by Law and did not believe Law would do anything while he knew Thayer was still around. Lopez, meanwhile, was still watching Law's car. A few minutes after Thayer left the area, Lopez reported that Law got into his vehicle and left the area. Thayer attempted to follow Law but Law was speeding away from the area and Thayer did not want to pursue him.

[¶ 9] Thayer and Lopez both returned to AC's house. Law enforcement was contacted, and Officer Robert Bower responded. Officer Bower took statements from AC, Lopez, Thayer, and the neighbor. Officer Bower then went to interview Law. Law was not home so Officer Bower waited until Law returned. Officer Bower observed Law drive up and park in the driveway in the vehicle whose description he had been given. Officer Bower approached Law while Law was still in his car, identified himself, and asked if he could speak to him about a report from AC implicating him in violating the no-contact order and stalking. Law voluntarily agreed to speak to Officer Bower, turned off his car and exited the car so they could speak.

[¶ 10] Officer Bower asked Law why he had been in the neighborhood where AC lived. Law denied being in that neighborhood. Officer Bower indicated to Mr. Law that he did not believe Law. Law then said that he had visited a store in the area but had not stopped anywhere near AC's neighborhood. Because Law continued to lie to Officer Bower, Officer Bower placed Law under arrest for stalking. Law gave Officer Bower permission to search his vehicle. As a result of this consensual search, Officer Bower found a large knife in the passenger compartment of Law's vehicle. The knife was on the backseat floorboard accessible to Law from the driver's seat. When asked about the knife, Law replied that it was his grand-

father's from World War II and he always carried it with him in his vehicle for protection. The knife found in Law's car was introduced into evidence in Law's trial. AC testified that she had never seen the knife and had never known Law to carry a knife in his car when they were together.

[¶ 11] Officer Bower informed Law of his Miranda rights and Law agreed to continue to talk to the officer. Initially Law continued to deny that he had stopped anywhere near AC's neighborhood. When Officer Bower informed Law that he had three independent witnesses who saw him in the neighborhood, Law changed his story. Law stated that he had received a call on his cell-phone from his son and pulled over to talk to his son. He just happened to be in AC's neighborhood when he pulled over. Law stated he did not get out of the car at any time. Officer Bower told him the witnesses saw him outside his vehicle and Law changed his story again, stating that he got out of the vehicle for better reception on his cell-phone, but never left the side of the car. Officer Bower told Law the witnesses placed him away from his car. Law then suggested he may have walked a little distance from the car toward an alley but he never entered the alley. Officer Bower informed Law that he had been seen in the alley. Law stated he did walk down the alley but had no idea he was headed towards AC's house. He was paying attention to the phone conversation. Officer Bower asked Law why he hid behind a pickup truck. Law stated that he was not hiding but only inspecting the truck because it was for sale. Although Officer Bower told Law he was being arrested for stalking, Law repeatedly told Officer Bower that he had not violated the no-contact order because he was not driving on any of the restricted streets. When asked at trial why he lied to Officer Bower about his being in AC's neighborhood, Law testified that he did not want AC to know he had been in her neighborhood.

[¶ 12] In an attempt to verify that Law received a phone call from his son around 6:00 p.m., Officer Bower, with Law's assistance, scrolled through the received calls section of Law's cell phone. No in-coming call was registered around 6:00 p.m. A call that

Law stated was from his son registered at 6:50 p.m. and Law then stated his son must have called twice. Law stated he must have erased the earlier call, although the received calls section reflected numerous other calls.

[¶ 13] AC received the last hang-up phone call from a pay phone on April 5, 2002. The pay phone was traced to the Laramie County Jail where Law was being detained. Law was tried and convicted by a jury of stalking AC by his actions on April 4, 2002.

## DISCUSSION

### *Introduction Of Evidence*

#### 1. *Standard of Review*

[¶ 14] Decisions regarding the introduction of evidence are committed to the sound discretion of the trial court. A trial court's ruling regarding the admission of evidence will not be disturbed absent a finding of a clear abuse of discretion.

Rulings on the admissibility of evidence are within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of a clear abuse of discretion. *English v. State,* 982 P.2d 139, 143 (Wyo.1999) (citing *Simmers v. State,* 943 P.2d 1189, 1197 (Wyo.1997)). We will not overturn a trial court's discretionary decision unless the court acted in a manner exceeding the bounds of reason and could not rationally conclude as it did. *Id.; Simmers,* 943 P.2d at 1197. Decisions of the trial court with respect to the admissibility of evidence are entitled to considerable deference and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be reversed on appeal. *English,* at 143; *Simmers,* at 1197. It is also well settled that a district court judg-

ment may be affirmed on any proper legal grounds supported by the record. *English,* at 143; *Bird v. Rozier,* 948 P.2d 888, 892 (Wyo.1997).

*Billingsley v. State,* 2003 WY 61, ¶ 9, 69 P.3d 390, ¶ 9 (Wyo.2003).

[¶ 15] More specifically, considerable deference is given a trial court's decision regarding the admissibility of evidence pursuant to W.R.E. 401 and 402.[3] *Oukrop v. Wasserburger,* 755 P.2d 233, 238 (Wyo.1988) (in reviewing a trial court's determination of admissibility of evidence pursuant to W.R.E. 401 and 402, "we must recognize that rulings with respect to the admission of evidence are within the sound discretion of the trial court, and those rulings are entitled to considerable deference.") This Court will not overturn a trial court's determination regarding the admissibility of evidence pursuant to W.R.E. 403[4] as long as a legitimate basis exists supporting the determination. *Gleason v. State,* 2002 WY 161, ¶ 20, 57 P.3d 332, ¶ 20 (Wyo.2002). "When appellant claims the testimony was unduly prejudicial under Rule 403, W.R.E., he must demonstrate that the evidence had little or no probative value and that it was extremely inflammatory or introduced for the purpose of inflaming the jury." *Apodaca v. State,* 627 P.2d 1023, 1027 (Wyo. 1981) (footnote omitted).

#### 2. *Introduction of the knife into evidence*

[¶ 16] The trial court allowed the knife found in the passenger compartment of Law's car to be introduced into evidence by the State. The State introduced the knife at trial in its case-in-chief through Officer Bower. AC testified that she had never seen that particular knife before, and that Law never carried a knife with him for protection while they were together. Law argues that

---

**3.** Rule 401. Definition of "relevant evidence".

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Rule 402. Relevant evidence generally admissible; irrelevant evidence inadmissible.

All relevant evidence is admissible, except as otherwise provided by statute, by these rules, or by other rules prescribed by the Supreme Court. Evidence which is not relevant is not admissible.

**4.** Rule 403. Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

the trial court abused its discretion when it allowed the introduction of this knife into evidence because his possession of the knife in his car is irrelevant to any material fact at issue in this trial. Law argues his possession of the knife is irrelevant because he did not use the knife against AC, and in fact AC did not even know he possessed the knife. Additionally, Law argues that, even if this Court were to find that his possession of the knife was somehow relevant, the prejudice of its introduction far outweighs any relevancy, requiring its exclusion under W.R.E. 403.

[¶ 17]   We first must determine if Law's possession of the knife in his car at the time of his arrest is relevant. Evidence is always relevant if it tends to prove or disprove one of the elements of the crime charged. W.R.E. 401. The elements of stalking as defined by § 6–2–506(b), are that Law, with the intent to harass AC, engaged in a course of conduct reasonably likely to harass AC. Section 6–2–506(a)(i) defines "course of conduct" as "a pattern of conduct composed of a series of acts over any period of time evidencing a continuity of purpose." The same statute defines "harass" as "to engage in a course of conduct, including but not limited to verbal threats, written threats, vandalism or nonconsensual physical contact, directed at a specific person or the family of a specific person, which the defendant knew or should have known would cause a reasonable person to suffer substantial emotional distress, and which does in fact seriously alarm the person toward whom it is directed." § 6–2–506(a)(ii).

[¶ 18]   The State argues that the knife was relevant to show that Law intended to harass AC and to show Law engaged in a course of conduct intended to harass AC. The State directs the attention of this Court to *Vit v. State*, 909 P.2d 953 (Wyo.1996), to support its contentions. In *Vit*, statements made by Vit to friends and a mental health therapist to the effect that he was considering physically harming his stalking victim were introduced into evidence. On appeal, Vit attacked the introduction of the statements on the grounds that they were not relevant because his victim was not aware of the statements. The *Vit* Court affirmed the admission of the statements, stating in part

that the statements were probative of Vit's criminal intent. *Id.* at 957–58.

[¶ 19]   We fail to discern any similarity between the facts in this case and the facts in *Vit*. Vit's statements claiming he was contemplating physically harming his stalking victim were directly probative of Vit's criminal intent. In the case sub judice, all we have is possession of a knife in a car. There simply is no evidence linking Law's possession of the knife in his car to any act relating to AC. Law did not use the knife or the fact of his possession thereof to directly threaten AC. Law did not tell anybody that he intended to physically harm AC. There is no evidence even that Law ever carried the knife on his person.

[¶ 20]   Law's possession of a knife in his vehicle does not indicate anything regarding his intended use of the knife. It certainly does not reasonably lead to the inference that Law intended to use the knife against AC in any manner. Further, harassment under the statute does not require physical threats and the State did not affirmatively allege that Law physically threatened AC. In the final analysis, Law's possession of the knife in his vehicle when he was arrested, in and of itself, has no relevance to any fact material to the charge of stalking as presented in this case. Specifically, the fact that Law possessed a knife in his car at the time of his arrest cannot reasonably be used to infer anything concerning Law's intent or course of conduct in relation to AC.

[¶ 21]   The State also argues that Law's credibility was called into question because he told Officer Bower that he always carried it with him in his car for protection, while AC testified that she previously had never seen that particular knife, and that Law never carried a knife in his car when they were together. Since we have already ruled that Law's possession of the knife is irrelevant to the charges against him, however, questioning AC regarding the knife as a means of impeachment through contradicting Law's statements to the police officer constitutes improper impeachment because it involves a collateral matter.

[¶ 22]   The rule against impeachment on collateral matters often arises in

connection with a criminal defendant attempting to impeach a witness, but the rule applies to any attempt to impeach credibility. This Court previously has explained the rule:

Both the Sixth Amendment to the Constitution of the United States and Article 1, § 10 of the Constitution of the State of Wyoming preserve the right to confront witnesses testifying against a defendant. The right is not without its limitations, however, and "[c]ourts recognize what might be called a hard-edged limit on impeachment by contradiction, drawn from common-law tradition and captured in the notion that contradiction on 'collateral matters' is improper." 3 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 320 (2d ed.1994). Contradicting a witness, as Daniel attempted here, is a recognized method of impeachment by showing something the witness said is erroneous. The New York court defined the rule regarding impeachment on cross-examination of a witness, using collateral matters through extrinsic evidence, and had this to say:

The general rule is that a cross-examiner cannot *contradict* a witness' answers concerning collateral matters by producing extrinsic evidence for the *sole purpose* of impeaching credibility. However, an exception to this rule exists where the evidence sought to be introduced is relevant to some issue in the case *other than* credibility or if independently admissible to impeach the witness. The reason for this exception to the collateral evidence rule is evident from the policy considerations underlying the general rule. The collateral evidence rule is said to rest upon auxiliary policy considerations of preventing undue confusion of issues and unfair surprise by extrinsic testimony. Also, testimonial errors concerning distant and unconnected points are of inferior probative value.

*People v. Schwartzman*, 24 N.Y.2d 241, 299 N.Y.S.2d 817, 821, 247 N.E.2d 642, 644–45 (1969), *cert. denied*, 396 U.S. 846, 90 S.Ct. 103, 24 L.Ed.2d 96 (1969) (emphasis in original, citations omitted).

*Daniel v. State*, 923 P.2d 728, 738–39 (Wyo. 1996). Under the facts in *Daniel*, this Court concluded the general rule had been violated:

Daniel's effort to impeach the doctor was contrary to the general rule because his cross-examination endeavored to contradict her answers relating to collateral matters by inquiring into extrinsic evidence for the sole purpose of impeaching credibility. This effort does not fit the exception to the rule because the evidence sought to be introduced was not relevant to some issue in the case other than credibility nor was it independently admissible to impeach the witness. There would have been the danger of causing undue confusion of issues, unfair surprise by extrinsic testimony, and little, if any, probative value.

*Id.* at 739. The rule extends to attempts to introduce evidence by other methods than simply cross-examination:

The latitude allowed counsel on cross-examination and rebuttal is a matter within the sound discretion of the trial court, and a reviewing court should not interfere unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant. (*People v. Collins* (1985), 106 Ill.2d 237, 269, 87 Ill.Dec. 910, 924, 478 N.E.2d 267, 281.) Generally speaking, any permissible kind of impeaching matter may be developed on cross-examination, since one of the purposes of cross-examination is to test the credibility of the witness. (106 Ill.2d at 269, 87 Ill.Dec. at 924, 478 N.E.2d at 281.) However, the cross-examiner may not impeach a witness on a collateral matter. (106 Ill.2d at 269, 87 Ill.Dec. at 924, 478 N.E.2d at 281.) Collateral matters are generally considered to include facts irrelevant to the substantive issues in the case and facts which are not independently provable by extrinsic evidence, apart from impeachment purposes. (*People v. McGhee* (1974), 20 Ill.App.3d 915, 922, 314 N.E.2d 313, 319; McCormick, *Evidence* § 47, at 101–02 (1954).) The test which determines if a matter is collateral is whether the matter could be introduced for any purpose other than to contradict. (*Collins*, 106 Ill.2d at 269, 87 Ill.Dec. at 924, 478 N.E.2d at 281.) We reiterate that

defendant does not contend that the trial court erred in limiting the cross-examination of Teri H. Instead, defendant argues that the trial court erred by not allowing three witnesses to contradict her testimony elicited under cross-examination. Whether Teri H. neglected her child was not the issue in this case, and such evidence could not be introduced for any purpose other than to contradict. Therefore, evidence that Teri H. left her child alone or tried to give her child away on prior occasions is collateral to this case, and extrinsic evidence was properly barred by the trial court. We find no abuse of the trial court's discretion.

*People v. Hutson*, 223 Ill.App.3d 50, 165 Ill. Dec. 541, 584 N.E.2d 975, 978 (1991).

[¶ 23]   In the case sub judice, the State in its case-in-chief asked AC about a knife she had never seen. AC then testified that she had never known Law to carry a knife in his car for protection. The State then introduced the knife (the knife AC had never seen) through Officer Bower for the simple reason that it had been found on the floorboard of the back seat of Law's car. The State then elicited testimony from Officer Bower that Law claimed he always carried the knife in his car for protection. This is the sum total of evidence surrounding Law's possession of the knife in his vehicle at the time of his arrest.

[¶ 24]   While drawing reasonable inferences from evidence is allowed, it is no more reasonable to infer that the mere presence of a knife in a car supports stalking conduct than to infer the mere presence of a knife infers intent to commit murder. The evidence regarding Law's possession of the knife in his car simply has no relevance to Law's state of mind regarding the charge of stalking AC, it is not probative of his intent towards ACl and it is not probative of any course of conduct by Law in relation to the stalking charge. Since Law's possession of the knife in his car has no relevance to the case, it is a completely collateral matter and as such cannot be introduced solely to impeach Law's credibility. Under the facts of this case, especially where no threat of physical harm was ever alleged by the State, this

Court is compelled to conclude that the trial court abused its discretion in allowing evidence of Law's possession of a knife in his car at the time of his arrest to be admitted.

[¶ 25]   It remains to be determined, however, whether the error in allowing the introduction of this evidence affected Law's substantial rights. W.R.A.P. 9.04 (on appeal, this Court disregards harmless errors). An error is harmful if there is a reasonable possibility that the verdict might have been more favorable to the defendant had the error never occurred. To demonstrate harmful error, the defendant must show prejudice under "circumstances which manifest inherent unfairness and injustice, or conduct which offends the public sense of fair play." *Seward v. State*, 2003 WY 116, ¶ 13, 76 P.3d 805, ¶ 13 (Wyo.2003); *Wilks v. State*, 2002 WY 100, ¶ 21, 49 P.3d 975, ¶ 21 (Wyo. 2002); *Johnson v. State*, 790 P.2d 231, 232 (Wyo.1990).

[¶ 26]   In his brief, Law presents this Court with no specific argument on how, in view of the entire record, Law suffered prejudice to a substantial right by the erroneous introduction of the knife. Law's argument is essentially limited to a single sentence: "Confidence in the verdict is undermined when highly prejudicial, irrelevant evidence is admitted at a trial with so little direct evidence of a course of conduct." Law points out that it was never proven that he had any role in any of the alleged problems AC was having prior to April 4, 2002. Therefore, the verdict may possibly have been more favorable to Law had the knife not been admitted into evidence.

[¶ 27]   This Court is reluctant to do Law's work for him and search the record for prejudice. Suffice it to say that, reviewing the record as a whole, the evidence regarding the knife was minimal. The State mentions the knife three times: twice in its case-in chief and once in closing. The State offered the knife into evidence through Officer Bower, who only identified it as a knife Law stated he always kept in the car for protection. AC testified she had never seen the knife before and never knew Law to keep a knife in his car for protection. These references are minimal. Of slightly more concern was the

State's reference to the knife in closing. In its closing argument, upon showing the jury the knife, the State argued:

> She said he never carried this in his car the whole time that she knew him. The whole time they were married and dated, never saw this in his. car before. You figure it out. You will get to look at that. Oh, nobody saw him carrying this. Nobody saw him carry it that day. He had a waist length coat on, folks. Draw your own conclusion, that's what you're here for.

[¶ 28] The defense referred to the knife twice. On cross-examination, the defense elicited from the neighbor that he had not noticed anything in Law's hands when he saw him running in the alley on April 4. Then, upon cross-examination of Officer Bower, the defense posed several questions, the answers to which strongly emphasized that no witness interviewed by Officer Bower mentioned a knife, and Officer Bower was in no way suggesting that Law ever possessed the knife on his person. The defense was thus able to effectively underscore that AC was not aware of the knife, had never seen the knife, Law was never seen carrying the knife, and Law never threatened AC with the knife.

[¶ 29] The defense did not request any limiting instruction regarding the evidentiary purpose of the knife. The State took advantage of this free reign to argue in closing that the jury was free to infer that Law was carrying the knife with him when he was in AC's neighborhood on April 4. While prejudicial in the sense that the presence of the knife suggested Law might have been willing to resort to physical violence against AC, we do not think the introduction of the knife into evidence substantially impacted the jury's verdict. The State never alleged that Law threatened AC with physical violence, while the defense clearly showed that there was no evidence that Law ever carried the knife on his person. Harassment in the form of physical violence was not an element of the crime of stalking as presented by the State. The State produced considerable evidence of harassment by means of surveillance and unwanted communication. The jury was presented with ample evidence from which it could convict Law of stalking as charged. Under the facts of this case, we do not think the introduction of the knife had a substantial impact on the verdict of the jury, nor can we say that the defendant has shown prejudice under "circumstances which manifest inherent unfairness and injustice, or conduct which offends the public sense of fair play." *Johnson,* 790 P.2d at 232.

### Prosecutorial Misconduct

#### 1. Standard of Review

[¶ 30] At trial, Law did not object to any of the issues of alleged prosecutorial misconduct he brings before this Court on appeal. Although not raised before the trial court, this Court may review Law's allegations of prosecutorial misconduct for plain error.

> Under our cases, in order to invoke the plain error doctrine, the following elements must be present: (1) the record must demonstrate clearly what occurred at trial without resort to speculation; (2) a clear and unequivocal rule of law must have been violated in an obvious way; and (3) this violation must have adversely affected some substantial right of the accused.

*Williams v. State,* 2002 WY 136, ¶ 12, 54 P.3d 248, ¶ 12 (Wyo.2002). With regard to prosecutorial misconduct generally, this Court has stated:

> Claims of prosecutorial misconduct are settled by reference to the *entire* record and hinge on whether a defendant's case has been so prejudiced as to constitute denial of a fair trial. *King v. State,* 780 P.2d 943, 951 (Wyo.1989). Similarly, the propriety of any comment within a closing argument is measured in the context of the *entire* argument. *Virgilio v. State,* 834 P.2d 1125, 1127 (Wyo.1992). A trial court's rulings as to the scope of permissible argument will not be disturbed absent a "clear or patent" abuse of discretion. *Mayer v. State,* 618 P.2d 127, 132 (Wyo.1980). Even then, reversal is not warranted unless a reasonable probability exists, absent the error, that the appellant may have enjoyed a more favorable verdict. *Trujillo v. State,* 750 P.2d 1334, 1337 (Wyo.1988)

(quoting *Jones v. State,* 735 P.2d 699, 703 (Wyo.1987)). Failing to timely object to an improper closing argument, the appellate threshold for reversal is "a substantial risk of a miscarriage of justice." *Dice v. State,* 825 P.2d 379, 384 (Wyo.1992).

*Arevalo v. State,* 939 P.2d 228, 230 (Wyo. 1997). The defendant has the burden of proving there was a reasonable probability of a more favorable verdict absent the alleged error. *Simmons v. State,* 2003 WY 84, ¶ 27, 72 P.3d 803, ¶ 27 (Wyo.2003); *Moore v. State,* 2003 WY 153, ¶ 29, 80 P.3d 191, ¶ 29 (Wyo. 2003). Further, "[p]lain error is difficult to find in closing argument, lest the trial court becomes required to control argument because opposing counsel does not object." *Taul v. State,* 862 P.2d 649, 659 (Wyo.1993).

### 2. Voir Dire

[¶ 31] Rule 24, W.R.Cr.P., governs the selection of trial jurors. Law alleges that the State violated several restrictions imposed by Rule 24(c) during the course of its voir dire. Rule 24(c) states:

(c) *Examination of jurors.*—After the jury panel is qualified the attorneys or a *pro se* defendant shall be entitled to conduct the examination of prospective jurors, but such examination shall be under the supervision and control of the judge, and the judge may conduct such further examination as the judge deems proper. The judge may assume the examination if counsel or a *pro se* defendant fail to follow this rule. If the judge assumes the examination, the judge may permit counsel or a *pro se* defendant to submit questions in writing. The examination shall be on the record.

(1) The only purpose of the examination is to select a panel of jurors who will fairly and impartially hear the evidence and render a just verdict.

(2) The court shall not permit counsel or a *pro se* defendant to attempt to precondition prospective jurors to a particular result, comment on the personal lives and families of the parties or their attorneys, nor question jurors concerning the pleadings, the law, the meaning of words, or the comfort of jurors.

(3) In voir dire examination counsel or a *pro se* defendant shall not:

(A) Ask questions of an individual juror that can be asked of the panel or a group of jurors collectively;

(B) Ask questions answered in a juror questionnaire except to explain an answer;

(C) Repeat a question asked and answered;

(D) Instruct the jury on the law or argue the case; or

(E) Ask a juror what the juror's verdict might be under any hypothetical circumstance.

Notwithstanding the restrictions set forth in subsections 24(c)(3)(A)-(E), counsel or a *pro se* party shall be permitted during voir dire examination to preview portions of the evidence from the case in a non-argumentative manner when a preview of the evidence would help prospective jurors better understand the context and reasons for certain lines of voir dire questioning.

[¶ 32] Pursuant to W.R.Cr.P. 24(c)(1), the purpose of voir dire is to choose jurors who will be fair and impartial:

In Wyoming, the purpose of voir dire is to seek to establish grounds for challenge for cause; assess any individual bias as to each member of the panel; and to arrive at a determination of the potential jurors' ability to decide a case fairly. *Herdt* [*v. State,* 891 P.2d 793 (Wyo.1995) ]; *Summers v. State,* 725 P.2d 1033 (Wyo.1986), *confirmed on reh'g,* 731 P.2d 558 (1987); *Gresham v. State,* 708 P.2d 49 (Wyo.1985); *Jahnke v. State,* 682 P.2d 991 (Wyo.1984); *Hopkinson v. State,* 632 P.2d 79 (Wyo. 1981), *cert. denied,* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982); *Lopez v. State,* 544 P.2d 855 (Wyo.1976). It is clear from our cases that the process is one of jury selection, not jury indoctrination.

In accordance with the rule, voir dire is subject to the supervision and control of the trial judge. The rulings of the trial judge are given deference within the permissible bounds. The authority of the trial court is discretionary and "[t]he only inhibition regarding the discretion of the trial

court is that it must be exercised subject to the essential demands of fairness." *Jahnke*, 682 P.2d at 999.

*Vit*, 909 P.2d at 960.

[¶ 33] One area of alleged error occurs when the State asked individual jurors what their definition of stalking would be, how they would feel if they were being stalked, and what they would do, specifically, if they were a single mother being stalked:

State: Anyone ever hear of stalking before today? Ever hear of that word used? Come on, don't be shy. Someone has heard of it. I had to get a feel. Ms. Murdoch, what do you think stalking is?

Juror Murdoch: Watching somebody.

State: Okay. Watching somebody. Ms. Schmidt, what do you think? Could it be more than watching somebody, something different?

Juror Schmidt: Sure. Um, invading their privacy.

State: Invading their privacy. That's a good word. I like that. Ms. Schmidt, how would you feel if someone kept calling your house repeatedly and hanging up on you? How would you feel?

Juror Schmidt: It would be irritating.

State: It would be irritating. And, Mr. Horen, how would you feel if someone was doing that [sic] you?

Juror Horen: I wouldn't like it.

State: You wouldn't like it. How about,— let's see, who do we get to pick on now. I'm trying to figure who I haven't picked on.

Ms. Schmidt, how would you feel if that person were driving by your house all the time?

Juror Schmidt: I wouldn't like it.

State: How would you feel?

Juror Schmidt: I might be scared of what they would do to me.

State: Scared. That's a good word. Now, let's say that is happening to someone you know that's a single woman. How do you think she would feel, folks? Do you think scared would apply? Irritated? Annoyed?

(Nodded head.)

State: Now, is there anyone here that thinks you have to be scared? Could it be stalking and you're just irritated or annoyed. Does anyone think that, like Mr. Horen said, he would be annoyed on those calls? Maybe he wouldn't be scared. He's a big guy. Maybe he's not scared about it, maybe it's some tiny person doing this. Do you think you can still stalk somebody even though you didn't scare them?

(Nodded head.)

State: So that would still be wrong?

(Nodded head.)

State: Okay. If someone were doing those kinds of things to you, what should you do? Ms. Doering, what should you do if somebody was doing this to you?

Juror Doering: I would report it to somebody?

State: Report it to somebody. Mr. Jeffres?

Juror Jeffres: Yes sir.

State: Excuse my point—I'm sorry. What would you do?

Juror Jeffres: I would probably confront the person.

State: Okay. And what if you were that single woman that I was talking about and then the person doing this was a man. Would you think she should do the same thing? Would that be a good idea?

Juror Jeffres: Probably not.

State: And he gave me a honest and a fair answer, to confront them. That would be my inclination. Maybe I'm a little old school. I know what the law says, but I would probably say, hey, what are you doing?

But it kind of changes when you change the circumstances a little. It's not Mr. Jeffres. It's not a male. It's a single mother.

All right. You say call the police or report it to some one. Are the police good people to call?

Juror Jeffres: Yes.

The Court: How about, has anyone heard of the procedure in issue here of a stalking order or a no contact order?

(Nodded head.)

State: You all have heard of that?

(Nodded head.)

State: Might that be a good idea to try to get one of those?

(Nodded head.)

State: Mr. Watt.

Mr. Watt: Yes, sir. It will take some time. You have to go to court to acquire that. And that would be appropriate.

State: Did you hear his answers, folks? That would be a good idea, but it takes time, you've got to go to court. Now, what if you did all those things and that person didn't stop? They kept calling and driving by? What do you do? That's kind of a rhetorical question. I don't know that I want to hear your answers to that, but it's something that I wanted you to think about—be sure you are thinking about it.

[¶ 34] We accept that this line of questioning during voir dire violated clear and unequivocal rules of law in an obvious way. The State was blatantly preconditioning the jury by arguing its case to the jury. With the aid of the jury, the State set out its definition of harassment and invited the members of the jury to rely upon their own feelings and emotions to conclude that a single mother would be seriously alarmed by such harassment. Essentially, the State made a serious attempt to prove elements of stalking—that AC was seriously alarmed by Law's harassing actions—through voir dire. The State also used voir dire to impermissibly inject issues broader than the guilt or innocence of the accused by inviting the jury to emotionally sympathize with AC. *See Hart v. State*, 2003 WY 12, ¶ 14, 62 P.3d 566, ¶ 14 (Wyo. 2003).

[¶ 35] It remains to be determined, however, if, within the context of the entire record, such error resulted in a substantial risk of a miscarriage of justice. As blatant as the error was, this Court does not believe the error denied Law a fundamentally fair trial. The evidence against Law was strong. He was seen by three independent witnesses in AC's neighborhood after she had filed for a stalking protection order and been issued a no contact order against Law. The State presented ample circumstantial evidence from which the jury could reasonably have

inferred that Law engaged in a course of conduct intended to harass AC. Law knew AC did not want him in her neighborhood. When Law testified at trial he testified that he lied to Officer Bower because he didn't want AC to know he was in her neighborhood. Yet direct evidence placed Law in AC's neighborhood anyway.

[¶ 36] The jury was instructed that the "statements, questions, and arguments of counsel are not evidence." The jury was also instructed on the legal definition of "harass" as contained in the statute. The jury also heard uncontradicted evidence from AC that she was scared. Officer Bower corroborated that evidence by testifying that AC was concerned for her safety and that AC was "visibly scared" when he interviewed her on April 4. Given the evidence properly presented to the jury during trial, we cannot say that there was a reasonable probability of a more favorable verdict for Law absent the error in voir dire.

[¶ 37] Other issues Law complains of in voir dire include the fact that the State went into considerable detail and gave numerous examples of circumstantial evidence and the inferences that can be drawn therefrom, leading to the inappropriate use of a hypothetical, and arguing the meaning of words and the law. After a thorough review, this Court does not find plain error in any of the other complained of actions.

*3. Closing*

[¶ 38] Law argues one specific passage from the State's rebuttal closing constitutes plain error. The language at issue is:

State: Folks, [AC] was annoyed. She was frustrated. She was scared. She was stalked. She was the victim. She did not deserve any of that. What she deserves is a protection of the law. What she deserves is justice. You are the ones that can give that to her. She's tried everything else. This is where we are at. Find him guilty.

Law argues that this language asks the jury to convict Law for reasons other than the evidence produced at trial. Law cites to *Wilks v. State*, 2002 WY 100, 49 P.3d 975

(Wyo.2002), as authority that the State crossed a line with this argument. The following are the pertinent facts from *Wilks:*

> Mr. Wilks asserts the prosecutor committed misconduct when he said to the jury, "Do your duty, please, and find the Defendant guilty of First Degree Murder." We are required to look at this statement in the context it was made. The full context of the prosecutor's statement is as follows:
>
>> Read the law. Please follow the law. It's all there for you. I don't want you to twist it, I don't want you to turn it. Just read it as it is and apply the facts to the law.
>>
>> There is no triumph greater that the ascertainment of the truth. That's your job. Do your duty, please, and find the Defendant guilty of First Degree Murder.
>
> "Generally, an exhortation to the jury to 'do the right thing,' to 'do your job,' or to 'do your duty' is error if it 'impl[ies] that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court's instructions on the law.'" *Jackson v. State,* 791 So.2d 979, 1029 (Ala.Crim.App. 2000), *cert. denied,* 532 U.S. 934, 121 S.Ct. 1387, 149 L.Ed.2d 311 (2001) (quoting *Arthur v. State,* 575 So.2d 1165, 1185 (Ala. Crim.App.1990)). Such a statement may also run afoul of the admonition against injecting issues broader than the guilt or innocence of the accused. *See* Standards for Criminal Justice 3–5.8(d), *supra.* When this statement is read in context, it is clear the prosecutor was not telling the jury that fulfillment of its duty could be achieved only through a first-degree murder conviction. Rather, the prosecutor explicitly encouraged the jury to do its duty and ascertain the truth and to apply the evidence to the given law. When the statement is reviewed in context, it is apparent there was not a transgression of a clear and unequivocal rule of law.

*Wilks,* ¶ 28. Law contends that, by arguing what AC "deserves," the State injected an issue broader than the facts of the case.

[¶ 39] "In analyzing claims of prosecutorial misconduct, we consider the prosecutor's argument in the context in which it was made and with regard to the evidence produced at trial." *Trujillo v. State,* 2002 Wy 51, ¶ 5, 44 P.3d 22, ¶ 5 (Wyo.2002). Law's defense was that AC was making everything up because she was afraid he would be granted sole custody of their son, and that AC wanted to get Law out of the way, so she concocted this entire story about being stalked. The State's above quoted comments were in response to the closing argument of Law painting himself as the victim of AC's machinations. While coming close to the line, we do not believe these remarks constituted plain error. The State did not argue that the only way for the jury to do its job would be to convict Law. The State did not argue that the only way AC could be protected would be if Law were convicted.

[¶ 40] Finally, reviewing the entirety of the State's closing argument and its rebuttal closing, it is clear the State argued that the jury must consider the facts introduced at trial. The State argued each element of stalking and discussed the evidence produced on each element. The State discussed Law's observed movements on April 4, 2002, and the fact that Law continuously lied about his whereabouts and movements that evening. In short, the State argued the facts. The State argued that the jury should look at the facts. The State argued that the facts prove that AC was the victim of stalking by Law and, based on the facts of the case, Law should be found guilty.

## CONCLUSION

[¶ 41] This was not a perfect trial, but then very few are. In fact a perfect trial is not required. "[T]he Constitution guarantees only a fair trial, not a perfect one." *King v. State,* 780 P.2d 943, 952 (Wyo.1989). When viewed in its entirety, we cannot say that any of the identified errors deprived Law of a fundamentally fair trial. Affirmed.

GOLDEN, J., delivers the opinion of the Court; KITE, J., files a specially concurring opinion, in which HILL, C.J., joins.

KITE, Justice, specially concurring, with whom HILL, Chief Justice, joins.

[¶ 42] While I concur with the result reached by the majority opinion, and with most of the reasoning in support of that result, I must part company with the conclusion that Mr. Law's possession of a knife was irrelevant to the elements of stalking, and therefore, improperly admitted into evidence. A person is guilty of the crime of stalking if he or she (1) engages in a course of conduct, (2) which means a pattern of conduct composed of a series of acts over any period of time evidencing a continuity of purpose, (3) directed at a specific person, (4) which the defendant knew or should have known would cause a reasonable person to suffer substantial emotional distress, and (5) which does seriously harm the person toward whom it is directed. Wyo. Stat. Ann. § 6–2–506 (Lexis-Nexis 2004).

[¶ 43] The State presented voluminous evidence concerning Mr. Law's course of conduct which demonstrated a continuity of purpose, e.g. to harass his estranged ex-wife. The majority concludes the evidence that Mr. Law had a weapon in the car at the time he was in her neighborhood on the night of his arrest was irrelevant because she was unaware of that fact and there was no direct evidence he intended to threaten her with the weapon. However, relevant evidence is any evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.R.E. 401.

[¶ 44] The State had to prove Mr. Law's actions constituted a course of conduct demonstrating a continuity of purpose. Evidence of all of Mr. Law's actions that night were relevant to proving he was engaged in a course of conduct as defined by the statute. At the time he was prowling through his estranged wife's neighborhood, down her alley, and hiding behind vehicles to avoid detection, she was unaware of his presence. Yet, no one argued the evidence of those actions was irrelevant because she was unaware of them. I perceive no difference between evidence of his actions that night and evidence of items he possessed at the time. A direct threat to use the knife was not needed to make evidence of it relevant.

[¶ 45] I also find *Vit v. State*, 909 P.2d 953 (Wyo.1996) supports my conclusion. Everything Mr. Law did that evening was relevant to his criminal intent even if it did not directly threaten his estranged wife. The jury could draw whatever inference it deemed appropriate from Mr. Law's possession of the knife. I would have held the district court properly exercised its discretion in admitting the knife into evidence.