2003 WY 61

## Richard BILLINGSLEY, Appellant (Defendant),

v.

## The STATE of Wyoming, Appellee (Plaintiff).

No. 01–120.

Supreme Court of Wyoming.

May 19, 2003.

392

Representing Appellant: Timothy C. Kingston of Graves, Miller & Kingston, P.C., Cheyenne, Wyoming.

Representing Appellee: Hoke MacMillan, Wyoming Attorney General; Paul S. Rehu-

rek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Georgia L. Tibbetts, Senior Assistant Attorney General; Theodore E. Lauer, Director, and Farrah L. Fraughton, Student Intern, of the Prosecution Assistant Program. Argument by Ms. Fraughton.

Before HILL, C.J., and GOLDEN, LEHMAN *, KITE, and VOIGT, JJ.

GOLDEN, Justice.

[¶ 1] Appellant Richard Billingsley was convicted of five counts of sexual intrusion against his three daughters. He was sentenced to three consecutive life sentences, plus two sentences of ten to twenty years to be served consecutively to the life sentences and consecutive to each other. He challenges that conviction, contending that the complaining witnesses had been improperly coached and influenced, the trial court erred in not permitting a defense expert's psychological examination and testimony, and the trial court erred by admitting the State's expert testimony at trial. We affirm.

## ISSUES

Billingsley states the issues as:

1. Did improper coaching and influence of the complaining witnesses render them incompetent to testify at trial?

2. Should the appellant's psychologist have been permitted to examine the girls to determine whether they had been improperly coached and influenced?

3. Did the lower court commit reversible error by allowing the prosecution's expert witness to testify about societal misconceptions of sexual abuse victims?

4. Did the lower court commit reversible error by allowing the prosecution's expert witness to testify about her diagnoses of the complaining witnesses?

5. Did the lower court commit reversible error by allowing the prosecution's expert witness to testify about what the complaining witnesses told her about what their father had done to them?

6. Did the lower court commit reversible error by allowing the prosecution's expert witness to testify outside of the scope of her designation by the prosecution?

The State presents these issues:

I. Did the district court abuse its discretion in determining that the child victims were competent to testify?

II. Did the district court abuse its discretion when it refused to allow appellant's expert to examine the child victims and to testify at the competency hearing regarding them?

III. Was the testimony of the State's expert witness properly admitted?

## FACTS

In June of 1999, Billingsley and his wife moved to Cheyenne with two of their three daughters. In July, their eldest daughter, who had been living out of state with her grandparents, joined them. Billingsley's brother, Ben, and Ben's wife, Mari, also lived in Cheyenne, and on the last weekend of January 2000, the three daughters of Billingsley, C.B, age 12, S.B, age 11, and B.B., age 10, spent a weekend with their Aunt Mari and Uncle Ben. On Saturday, Mari and C.B. went to the library to research a science project. S.B. had requested that her aunt get a book about menstruation, and Mari checked out a book entitled "The Teenagers' Guide to Sex and Their Bodies." S.B. looked through the book that day and later told her that S.B.'s father had been sexually abusing her and both of her sisters. Both S.B. and C.B. claimed that their father had engaged in sexual intercourse with all three girls for a number of years. Wanting to ascertain the girls' understanding of the meaning of "sex," Mari asked both girls a number of specific questions over many hours that weekend. The elder daughter was given a home pregnancy test which was negative. At their parents' request, the girls returned home on Sunday evening, and Mari and Ben notified authorities on the next Monday.

Detective Crumpton recorded an interview with C.B. at her elementary school

* Chief Justice at time of oral argument

on Monday afternoon in the presence of a school counselor. When asked if C.B. knew why the detective was there, C.B. responded, "because my dad has been having sex with me." C.B. kept a diary for several years that she wrote in sporadically. Months earlier, she had written: [1]

Dear Diary, my name is [C.B.]. I'm being treated bad. By my dad. He did something that he should not have done. He has had sex with me. I told him no. But he does not listen to me. But one day, Oct. 3, '98 to be exact I told him no and he listened for once. And he promised that he would not do it again, and he hasn't. So me and him are getting along now. He still asks once in a while, but I say no! The problem is that I am his daughter. And I am too young to start to have sex. Because I am only 11 years old. And if my mom ever found out, their marriage would end. That's why I don't tell!

 Later that day, C.B. was examined by Dr. Shana Tubach, a pediatrician. C.B. revealed to Dr. Tubach that C.B.'s father had been sexually abusing her for several years. The next day Dr. Tubach conducted a physical examination of C.B. that revealed that hymen tissue was no longer intact, an indicator of sexual activity. A physical examination of S.B. showed no evidence of recent sexual abuse; however, a physical examination of B.B. indicated that hymen tissue was no longer intact. On February 1 and 3, 2000, Lynn A. Huylar, project director for Safe Harbor, a children's justice advocacy center, conducted a videotaped interview of C.B. and her sisters. All three girls talked about numerous instances of sexual abuse over several years by their father.

[¶ 6] From this investigation, Billingsley was charged with one count of unlawfully inflicting sexual intrusion on C.B. during the period of June 1, 1999, to November 1, 1999, in violation of Wyo. Stat. Ann § 6–2–303(a)(vi) (person in position of authority causes victim to submit); two counts of unlawfully inflicting sexual intrusion on S.B. during the period of June 1, 1999, to January 31, 2000, in violation of Wyo. Stat. Ann. § 6–2–303(a)(v) (victim less than twelve years old and actor four years older than victim); and two counts of unlawfully inflicting sexual intrusion on B.B. for the same period and in violation of the same statute.

[¶ 7] Months later, in August of 2000, Dr. Gay Deitrich–MacLean, clinical psychologist, interviewed the three girls in preparation for testifying as a State expert at Billingsley's trial. Billingsley requested that his forensic psychologist be permitted to examine the three girls, but that examination was denied; however, the psychologist submitted an affidavit in which she stated that her examination of the video and audio tapes of the girls' interviews indicated coaching and tainted testimony. Billingsley contended that Mari was feuding with him over an incident where he had shot at her and her baby with a shotgun, and in retribution she had tainted the three girls' memory by coaching them. A competency hearing was held before trial testimony began. Billingsley's expert was not permitted to testify at the hearing, and the girls were found competent to testify.

[¶ 8] At trial, the State's witnesses included Ben and Mari, Dr. Tubach, Dr. Deitrich–MacLean, Dr. Huylar, Detective Crumpton, and the school counselor, with each testifying about statements the girls made to them consistent with the allegations the girls had made against their father. The three girls also testified. C.B. testified to being sexually assaulted by Billingsley in Cheyenne sometime in July of 2000, and stated that he sexually assaulted her once or twice each month. S.B. testified to several instances of abuse by her father while in Cheyenne. B.B. testified that she listened at the door as her sisters told Mari and Ben about the abuse, and told of many instances of abuse while in Cheyenne. Because S.B. and B.B. shared a bedroom, the two witnessed abuse of the other. Billingsley was convicted and sentenced, and this appeal followed.

1. The text of this diary entry is replete with misspelled words, which we have taken the liberty of correcting.

## DISCUSSION

[¶ 9] The district court's decisions admitting Dr. Deitrich–Maclean's testimony, finding the children competent to testify, and excluding Billingsley's expert witness from testifying at the competency hearing are evidentiary rulings that are reviewed under the same standard of review. Rulings on the admissibility of evidence are within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of a clear abuse of discretion. *English v. State*, 982 P.2d 139, 143 (Wyo.1999) (citing *Simmers v. State*, 943 P.2d 1189, 1197 (Wyo. 1997)). We will not overturn a trial court's discretionary decision unless the court acted in a manner exceeding the bounds of reason and could not rationally conclude as it did. *Id.; Simmers*, 943 P.2d at 1197. Decisions of the trial court with respect to the admissibility of evidence are entitled to considerable deference and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be reversed on appeal. *English*, at 143; *Simmers*, at 1197. It is also well settled that a district court judgment may be affirmed on any proper legal grounds supported by the record. *English*, at 143; *Bird v. Rozier*, 948 P.2d 888, 892 (Wyo.1997).

*Decision That The Children Were Competent To Testify*

[¶ 10] The Wyoming Rules of Evidence provide that "[e]very person is competent to be a witness except as otherwise provided in these rules." W.R.E. 601. "A person is generally competent to testify if he can understand, receive, remember and narrate impressions and is sensible to the obligations of the oath taken before testifying." *English*, 982 P.2d at 145 (citing *Simmers*, 943 P.2d at 1199); *see also Larsen v. State*, 686 P.2d 583, 585 (Wyo.1984). "Intelligence, not age, is the guiding criteria in determining the competency of a witness." *Baum v. State*, 745 P.2d 877, 879 (Wyo.1987). "It is a well-established principle of law that competency of witnesses to testify is a question within the sound discretion of the trial court." *English*, 982 P.2d at 145. "However, when children are called into the courtroom to testify, we have held that once the

child's competency is called into question by either party, it is the duty of the court to make an independent examination of the child to determine competency, and that determination will not be disturbed unless shown to be clearly erroneous." *Id.*

[¶ 11] We have directed the district courts to use a five-part test for determining the competency of child witnesses:

(1) an understanding of the obligation to speak the truth on the witness stand; (2) the mental capacity at the time of the occurrence concerning which he is to testify, to receive an accurate impression of it; (3) a memory sufficient to retain an independent recollection of the occurrence; (4) the capacity to express in words his memory of the occurrence; and (5) the capacity to understand simple questions about it.

*Id.; Larsen*, 686 P.2d at 585 (quoting *State v. Allen*, 70 Wash.2d 690, 424 P.2d 1021 (1967)).

[¶ 12] In *English*, we decided that the existing state of the law adequately addresses pretrial taint concerns and a pretrial taint hearing is not necessary. At the time of a child's competency hearing, a defendant can argue memory taint at that hearing to discredit the reliability of a child's testimony. We held that if a defendant can establish a child's memory of events has been corrupted by improper interviews, it is possible the third *Larsen* factor, "a memory sufficient to retain an independent recollection of the occurrence," may not be satisfied. *English*, 982 P.2d at 146.

[¶ 13] Although we declined to adopt a separate pretrial 'taint hearing' procedure, we did, however, endorse the use of the following factors as they relate to the question of independent recollection. *Id.*

The factors that should be considered in assessing the reliability of a complaint regarding sexual offenses are: "(1) the age of the victim; (2) circumstances of the questioning; (3) the victim's relationship with the interrogator; and (4) the type of questions asked." * * * Undue suggestiveness can occur when an interviewer has a preconceived notion of what has happened to a child, the interviewer uses leading questions, the interviewer is a trusted

authority figure, the person accused of wrongdoing is vilified during the interview, or the interviewer uses threats or rewards to pressure the child.

*Id.* (quoting *State v. Scherzer*, 301 N.J.Super. 363, 694 A.2d 196, 245–46 (1997) (summarizing and quoting *State v. Michaels*, 136 N.J. 299, 642 A.2d 1372, 1377–1383 (1994))).

[¶ 14] After the three girls testified at the competency hearing, the trial judge heard Billingsley's objection that their testimony was unreliable and not credible because of Mari's interviewing technique. The district court spent considerable time making findings on the record on each of the *Larsen* competency factors and the *English* taint factors. For each one, he explained his reasoning for finding the children competent to testify; and in summary he found that, of her own accord, S.B. had told Mari about the abuse because she trusted her and not because she was interrogated; that Mari had questioned the children to try to understand what the girls meant by "sex," and did not pressure or suggest the accusations; that, although Billingsley had given Mari reason to dislike him, there was no evidence that Mari had instigated accusations from any retaliatory motive against Billingsley; that the children were testifying from their own memory and had not indicated any reason to seek to hurt their father. Our review of the record shows that the record supports the district court's findings that the children were not stimulated or materially influenced by Mari's questioning and it did not infect their ability to independently recall events to such an extent that their testimony would be too unreliable to admit at trial. The record shows that each girl understood the gravity of their accusations against their father and provided the details necessary of their many instances of abuse to reassure, even on a cold record, that the district court accurately determined reliability and admissibility. We agree with the district court's statement: "it would be outlandish in view of the record we have here for this Court to enter an order that these children may not testify."

*Exclusion of Defense Expert Testimony from Competency Hearing*

[¶ 15] Billingsley acknowledges that under *Gale v. State*, 792 P.2d 570 (Wyo.

1990), the defense is not entitled to a psychological examination of the complaining witness; however, he claims that *Gale* preserved an exception to that rule when the competency of the complaining witness was at issue:

> We also note that this issue does not involve any challenge to the competency of the complainant witnesses in this case. Cf. *Easterday v. State*, 254 Ind. 13, 256 N.E.2d 901, 905–06 (1970). Our discussion on this issue is limited to resolving *Gale's* assertion of a right to have these victims examined and is not intended to express any view on the potential problem of witness compliance or competency.

*Id.* at 575.

[¶ 16] Based on this statement, he contends that his expert, Dr. Wendy Gersing, should have been permitted to interview the three girls to determine whether their anticipated trial testimony was tainted by improper interviewing techniques and, therefore, unreliable. *Gale* prohibited forced examinations for purposes of testifying about credibility or veracity. Because veracity is directly at issue, this rule necessarily includes pretrial taint issues that are the subject of a competency hearing. *Id.* at 575–76. The trial court did not err in denying the motion.

[14] [¶ 17] The district court denied Billingsley's motion for psychological and forensic examination of his children because his expert could listen and see audio and videotapes of the children's interviews to form an opinion whether the interviews were suggestive or coercive and caused the children's testimony to be unreliable. However, the district court ruled that the expert would be permitted to render an opinion at trial based on observations of those interviews. Billingsley's expert did review those interviews and submitted an affidavit in which she opined that the children's testimony was unreliable. Requesting that the expert be permitted to testify at the competency hearing, Billingsley used the affidavit as an offer of proof. The State objected to the proposed testimony. The trial court determined that

based upon W.R.E. 702, the expert's testimony did nothing to assist in determining whether the children were competent to testify and refused to permit the expert's testimony.

[¶ 18] Our review of the record indicates that Mari had asked leading questions to draw out specific information from the children about what their father had done to them. Based on these leading, specific questions, Billingsley claimed the children's testimony was tainted and unreliable. Consequently, the trial court had two issues to determine: whether the children's accusations were the product of suggestive or coercive techniques, and, if so, whether the technique tainted the testimony to such a degree as to render the testimony unreliable and, therefore, inadmissible. In his offer of proof, Billingsley stated that Dr. Gersing would demonstrate that the manner in which Mari and Ben had interrogated the children irreparably tainted their trial testimony, and would further testify that the children's statements to police and doctors were similarly tainted because of the interviewing techniques employed by those officials.

 [¶ 19] Although expert testimony is relevant in a competency hearing to demonstrate the coercive effects of certain interviewing techniques, the general rule that experts may not vouch for witness credibility still applies. In this case, the three children and Mari testified at the competency hearing; thus, the trial court's determination was properly focused only on Mari's questioning of the children. The record shows that the trial court understood that Mari's questioning had been leading and suggestive and that such an improper interviewing technique, particularly if maliciously motivated, could render the children's testimony too unreliable to be admissible at trial. The competency hearing focused on reliability, primarily by ascertaining whether the children had independent recall of events. The record shows that the State, the defense, and the court all questioned the girls on details surrounding their recollections of events and received direct, detailed answers. At the close of this testimony, the trial court properly concluded that expert testimony would not assist him in

determining reliability; and on these particular facts, we agree that the expert testimony would not have been of assistance to the trial court and find no error in that court's excluding the expert testimony.

[¶ 20] In the *Michaels* case relied upon by *English*, the New Jersey Supreme Court examined the role of expert testimony in a taint hearing. It stated:

Consonant with the presumption that child victims are to be presumed no more or less reliable than any other class of witnesses, the initial burden to trigger a pretrial taint hearing is on the defendant. The defendant must make a showing of "some evidence" that the victim's statements were the product of suggestive or coercive interview techniques.

That threshold standard has been met with respect to the investigatory interviews and interrogations that occurred in this case. Without limiting the grounds that could serve to trigger a taint hearing, we note that the kind of practices used here—the absence of spontaneous recall, interviewer bias, repeated leading questions, multiple interviews, incessant questioning, vilification of defendant, ongoing contact with peers and references to their statements, and the use of threats, bribes and cajoling, as well as the failure to videotape or otherwise document the initial interview sessions—constitute more than sufficient evidence to support a finding that the interrogations created a substantial risk that the statements and anticipated testimony are unreliable, and therefore justify a taint hearing.

Once defendant establishes that sufficient evidence of unreliability exists, the burden shall shift to the State to prove the reliability of the proffered statements and testimony by clear and convincing evidence. Hence, the ultimate determination to be made is whether, despite the presence of some suggestive or coercive interview techniques, when considering the totality of the circumstances surrounding the interviews, the statements or testimony retain a degree of reliability sufficient to outweigh the effects of the improper interview techniques. The State may attempt

to demonstrate that the investigatory procedures employed in a case did not have the effect of tainting an individual child's recollection of an event. To make that showing, the State is entitled to call experts to offer testimony with regard to the suggestive capacity of the suspect investigative procedures. The defendant, in countering the State's evidence, may also offer experts on the issue of the suggestiveness of the interrogations. However, the relevance of expert opinion focusing essentially on the propriety of the interrogation should not extend to or encompass the ultimate issue of the credibility of an individual child as a witness. The State is also entitled to demonstrate the reliability of the child's statements or testimony by proffering independent indicia of reliability. It bears repeating that the focus of the pretrial hearing is on the coercive and suggesting propensity of the investigative questioning of each child and whether that questioning, examined in light of all relevant circumstances, gives rise to the substantial likelihood that the child's recollection of actual events has been irremediably distorted and the statements and the testimony concerning those events are unreliable.

*State v. Michaels,* 136 N.J. 299, 642 A.2d 1372, 1383–84 (1994) (citations omitted).

[¶ 21] From this analysis, we see that the trial court granted Billingsley a competency hearing because he made a sufficient showing to trigger its necessity; the State used the girls' testimony at that hearing to establish independent indicia of reliability; and the trial court properly determined that under these particular facts the defense's expert testimony that the suggestiveness of Mari's technique had produced tainted testimony was unnecessary for him to hear before rendering a competency determination. We find no error.

*Trial Court's Evidentiary Rulings Concerning the Testimony of the Prosecution's Expert Witness, Dr. Gay Deitrich–MacLean*

[¶ 22] In Billingsley's final contentions of error, he claims the trial court erred in allowing the prosecution's expert witness,

Dr. Gay Deitrich–MacLean, to testify; and in allowing this witness's testimony to exceed the scope of the prosecution's written designation of this witness's testimony in two respects, namely, stating her "diagnoses" of each of the alleged victims and stating what each alleged victim told her about what Billingsley had done to them.

[¶ 23] In order to treat these contentions, it is helpful to provide factual context. In the prosecution's opening statement to the jury, the prosecutor told the jury that it would hear from a psychologist who specialized in issues surrounding sexual abuse of children. That witness would explain her general experience in reporting sexual abuse and "the things that you look for." In his opening statement, Billingsley's counsel emphasized that "what this case ultimately will be all about," is the "full story from these three girls;" that, although the jury was going to hear a lot of different testimony, the case is "going to come down to … whether you believe the story that they're going to tell you, and how will you know that they're going to be able to tell the truth." In regard to how the jury might be able to tell that these girls "might not be able to tell the truth in this matter," defense counsel asked the jury to consider 1) numerous inconsistencies and embellishments between their trial testimony and the stories they first told to the investigating authorities; 2) although the alleged sexual abuse allegedly started as many as seven years ago and these girls had numerous opportunities to reveal the abuse to trusted relatives, teachers, and friends, these girls never revealed the abuse to these trusted and safe authority figures; 3) until these allegations came to light, the girls' family was a happy family, the girls were doing well in school, the girls had friends, the girls had no reported psychological problems despite the alleged sexual abuse they were undergoing.

[¶ 24] During the prosecution's case-in-chief, the prosecutor called two witnesses before calling Dr. Deitrich–MacLean. When the prosecutor called Dr. Deitrich–MacLean, Billingsley's counsel stated to the trial court that the witness should not be allowed to testify because her testimony, as designated

by the prosecution, was not relevant to the case. The designation was contained in a document entitled "Notice of Recordns [sic] For Review and Objection to DFS Records Requested by Defense" which the prosecution had filed on September 26, 2000. The pertinent paragraph of that document read:

> Dr. Deitrich–MacLean's testimony will not encompass the [sic] in any manner any attempt at "diagnosing" the girls as sexually abused, nor in any fashion commenting on their credibility. Rather, her testimony will be offered to dispel generally widespread misconceptions regarding the behavior of sexual abuse victims.

Billingsley's counsel stated that at this stage of the trial there had not been any testimony or evidence about generally widespread misconceptions.

[¶ 25] Responding to Billingsley's counsel's argument, the prosecutor stated that this witness was called at this point of the trial to accommodate the witness's schedule and to meet that part of defense counsel's opening statement that "the defense is that these girls didn't act abused ... didn't tell any other trusted authority figures, and they had every opportunity to do that." Concluding on the matter, the prosecutor argued:

> So one of the key misconceptions Dr. MacLean's testimony is going to address [sic] the very affect that happens all the time. There are ample opportunities for kids to disclose, and they just don't do it, and that's exactly her specialty.

The prosecutor also informed the trial judge and defense counsel that the witness would review the purpose for which she performed psychological examinations on the girls, adding that "it wasn't to evaluate for sexual abuse." The prosecutor told defense counsel that the witness would answer defense counsel's questions arising from these evaluations.

[¶ 26] We hold that the trial court did not abuse its discretion in allowing Dr. Deitrich–MacLean to testify. The trial court exercised reasonable control over the order of the prosecution's interrogating witnesses and presenting evidence. W.R.E. 611(a). The prosecution called this witness when it did as an accommodation to the witness's schedule. Moreover, when defense counsel's opening

statement, either explicitly or implicitly, places behavior in issue, as it did here, we have consistently approved admission of expert testimony which explains the behavior of alleged sexual abuse victims. *Cook v. State*, 7 P.3d 53, 57 (Wyo.2000) (citing *Griego v. State*, 761 P.2d 973, 979 (Wyo.1988); *Scadden v. State*, 732 P.2d 1036, 1046–47 (Wyo.1987)). Dr. Deitrich–MacLean's testimony about misconceptions regarding the behavior of sexual abuse victims was relevant.

[¶ 27] We turn now to Billingsley's claim that the trial court erred in allowing Dr. Deitrich–MacLean's testimony to exceed the scope of the prosecution's written designation of this witness's testimony. Under this claim, Billingsley asserts that the witness stated her "diagnoses" of each alleged victim and stated what each alleged victim told her, during her interviews, about what Billingsley had done to them. In addressing these assertions, once again factual context is helpful. During the course of the prosecutor's direct examination of Dr. Deitrich–MacLean, the witness explained that the purpose of her psychological evaluation of these girls was to assist the State's Department of Family Services in making foster care placement decisions and treatment decisions. The witness made clear that she had not done a forensic evaluation for sexual abuse. In response to the prosecutor's interrogation, the witness explained the elements of the general psychological evaluations she performed. The prosecutor next asked the witness "what kind of diagnosis—if that's what you call it—did you come up with, results of that examination?" This question drew Billingsley's counsel's objection that the testimony exceeded the prosecutor's written designation that the witness would testify about misconceptions about the behavior of sexual abuse victims. The prosecutor then explained that the witness's testimony would not be sexual abuse diagnoses. The trial court overruled the defense objection. With respect to one of the girls, Dr. Deitrich–MacLean ruled out a diagnosis of post-traumatic stress disorder but concluded she was experiencing severe stress because of her out-of-home placement and the legal proceedings against her father. With respect to all three of the girls, Dr.

Deitrich–MacLean's assessment was they tended to internalize their feelings, but when they did express their feelings, "sometimes it's pretty dramatic." Given this factual context, we find no merit in Billingsley's complaint regarding "diagnoses." The trial judge saw a connection between the witness's limited "diagnoses" and the designation about "misconceptions," and we will not second guess that evidentiary ruling. Billingsley eschews specifics, relying on general bald assertions instead, and he cites no authority for his position. Most importantly, we fail to see how the witness's limited "diagnoses" bolstered the girls' own testimony, as alleged by Billingsley.

[¶ 28] In addressing Billingsley's complaint that the trial judge erred in allowing Dr. Deitrich–MacLean to testify about what each girl told her about what Billingsley had done to them, once more factual context is helpful. After Dr. Deitrich–MacLean's testimony about the results of her psychological evaluations of the three girls, the prosecutor asked whether Dr. Deitrich–MacLean's interviews with the girls revealed anything of significance to the sexual abuse issues. Defense counsel objected that "she would be getting into the exact area" that the designation stated she would not get into. The prosecutor explained that independent, spontaneous statements of the girls were relevant to counter Billingsley's defense that the girls never revealed to others the alleged incidents of sexual abuse. Billingsley countered that such testimony from Dr. Deitrich–MacLean amounts to vouching for the girls' credibility and to stating a sexual abuse diagnosis. The trial court overruled Billingsley's objection. Dr. Deitrich–MacLean then testified, under the prosecutor's questioning, that each girl told her that Billingsley had sexually molested each girl.

[¶ 29] In Billingsley's appellate briefing on this claim of error, his primary complaint is that Dr. Deitrich–MacLean's testimony in this regard was a repeat of what five other prosecution witnesses had testified about, i.e., what the girls had told them allegedly happened. Billingsley complains that the jury heard the girls' story "repeated over and over again." But Billingsley rests his complaint on bald assertions without any supporting law or cogent argument. The trial court saw a connection between Dr. Deitrich–MacLean's testimony relating the girls' spontaneous disclosures to her and Billingsley's argument that the girls had never reported the incidents to a person of trust. We hold the trial judge did not abuse his discretion in allowing this testimony.

[¶ 30] We affirm the judgment of conviction and sentence.