# IN THE SUPREME COURT, STATE OF WYOMING

# 2021 WY 16

OCTOBER TERM, A.D. 2020

January 28, 2021

JASON ARNOLD MILLER,

Appellant
(Defendant),

v.

S-20-0087

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Washakie County*
*The Honorable Bobbi Dean Overfield, Judge*

*Representing Appellant:*

Office of the State Public Defender: Diane Lozano, Wyoming State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Desiree Wilson,* Senior Assistant Appellate Counsel; Robin S. Cooper, Senior Assistant Appellate Counsel. Argument by Ms. Cooper.

*Representing Appellee:*

Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General. Argument by Mr. Eames.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

*Order Allowing Withdrawal of Counsel entered September 16, 2020.

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**GRAY, Justice.**

[¶1]    A jury convicted Jason Miller on three counts of first-degree sexual abuse of a minor.  On appeal, Mr. Miller claims the district court erred in admitting evidence of prior bad acts under W.R.E. 404(b)[1] and by refusing to conduct a pretrial taint hearing. We affirm.

## *ISSUES*

[¶2]    The issues are:

> 1. Did the admission of W.R.E. 404(b) evidence prejudice Mr. Miller?
>
> 2. Did the district court abuse its discretion in concluding A.B. was competent without further consideration of evidence of taint?

## *FACTS*

[¶3]    Mr. Miller married A.B.'s mother, K.B., in 2010.  In 2014, Mr. Miller and K.B. moved to Worland, Wyoming, with K.B.'s two children—A.B., born July 14, 2003, and A.B.'s sister, born June 5, 2007.  The family lived first with K.B.'s father and then for a short while with K.B.'s sister-in-law.  Over the next two years, the family moved to three different locations in Worland: in November 2014, they moved to a three-bedroom apartment on Third Street; in July 2015, they relocated to a residence on Charles Avenue; and in April 2016, they rented a two-bedroom apartment on Cloud Peak Drive.

[¶4]    In August 2016, Mr. Miller moved to Cheyenne.  He returned to Worland in September 2016.  He then rented the apartment across the hallway from K.B.'s apartment.  A.B. moved in with Mr. Miller because he would have his own bedroom— prior to the move he shared a room with his sister.

---

[1] W.R.E. 404(b) provides:

> (b) *Other crimes, wrongs, or acts.* – Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

1

[¶5]   K.B. testified that around September 2016, she walked into Mr. Miller's apartment and saw A.B. lying on the bed in his underwear.  Mr. Miller was in the room and jumped into a corner trying to hide an erection.  K.B. reported Mr. Miller to the Worland Police Department alleging A.B. had been sexually abused.  Worland Police Officer John Core and a Department of Family Services employee interviewed A.B. and videotaped the interview.  A.B. was later interviewed at the Children's Advocacy Project in Casper and also received counseling from two other individuals.

[¶6]   On November 2, 2018, the State filed a Felony Information charging Mr. Miller with six counts of first-degree sexual abuse of a minor.[2]  The information alleged the charged conduct occurred in Worland at various locations over a two-year period from August 2014 through September 2016.  Three of the counts were dismissed before trial. The three remaining counts alleged:

> Count I . . . Sexual Abuse of a Minor in the First Degree, during the timeframe of December 2014 to September 2015 [(Third Street apartment);]

---

[2] The crime of first-degree sexual abuse of a minor occurs when:

(a) An actor commits the crime of sexual abuse of a minor in the first degree if:

(i)  Being sixteen (16) years of age or older, the actor inflicts sexual intrusion on a victim who is less than thirteen (13) years of age;

(ii) Being eighteen (18) years of age or older, the actor inflicts sexual intrusion on a victim who is less than eighteen (18) years of age, and the actor is the victim's legal guardian or an individual specified in W.S. 6-4-402;

(iii) Being eighteen (18) years of age or older, the actor inflicts sexual intrusion on a victim who is less than sixteen (16) years of age and the actor occupies a position of authority in relation to the victim.

(b) Except as provided in subsection (c) of this section, a person convicted under subsection (a) of this section is subject to imprisonment for not more than fifty (50) years, unless the person convicted qualifies under W.S. 6-2-306(e).

(c) A person convicted under paragraph (a)(i) of this section, where the actor is at least twenty-one (21) years of age, is subject to imprisonment for not less than twenty-five (25) years nor more than fifty (50) years, unless the person convicted qualified under W.S. 6-2-306(e).

Wyo. Stat. Ann. § 6-2-314(a)–(c) (LexisNexis 2019).

Count II . . . Sexual Abuse of a Minor in the First Degree, during the timeframe of September 2015 to March 2016 [(Charles Avenue residence); and]

Count III . . . Sexual Abuse of a Minor in the First Degree, during the timeframe of September 1, 2016 to September 30, 2016 [(Cloud Peak Drive apartment).]

[¶7]    The district court scheduled trial for April 22, 2019.  Prior to trial, Mr. Miller filed a demand for notice of intent to use 404(b) evidence.  The State did not respond.  At trial, the State elicited unnoticed 404(b) evidence before the jury, resulting in a mistrial.  The district court set a second trial for August 26, 2019.

[¶8]    Before the second trial, the State filed a notice of intent to elicit 404(b) testimony. It requested the admission of earlier federal and state judgments against Mr. Miller.[3]  It also sought to introduce evidence of Mr. Miller's course of conduct leading up to the alleged sexual abuse charges, including: "testimony . . . as to sleeping arrangements"; K.B. witnessing Mr. Miller and A.B. masturbating together; K.B. finding Mr. Miller lying on top of A.B.; and Mr. Miller's statements regarding what is normal in a father-son relationship.  This uncharged conduct did not involve sexual intrusion, one of the elements of the charged conduct.  The State argued it was admissible to show that Mr. Miller engaged A.B. in a series of escalating sexual encounters (grooming) which eventually led to the charged conduct (fellatio and anal penetration).  Mr. Miller objected.

[¶9]    The district court heard argument on August 20, 2019.  As to anticipated 404(b) course of conduct testimony, the court ruled the evidence was admissible "to develop the circumstances of the case and the course of conduct . . . to the extent that it is not specific to charged conduct that has already been dealt with [in the earlier State charges]."  The district court did not, however, conduct the analysis required under *Gleason v. State*, 2002 WY 161, ¶ 30, 57 P.3d 332, 343 (Wyo. 2002) prior to its ruling.

[¶10]  Mr. Miller also filed a pretrial motion requesting a competency and taint hearing. He claimed A.B. had been subjected to an extensive number of interviews where inappropriate questioning techniques were used.  As a result, Mr. Miller contended A.B.'s version of events had been tainted, and A.B. could no longer provide an independent recollection of events.  The district court held a hearing and determined A.B. was competent to testify.  It also concluded Mr. Miller failed to present evidence warranting a further taint hearing.

---

[3] In 2017, Mr. Miller pled nolo contendere to a charge of third-degree sexual abuse of A.B. in violation of Wyo. Stat. Ann. § 6-2-316(a)(iv).  In 2018, Mr. Miller was convicted on a federal charge of possessing child pornography.

3

[¶11]   The case proceeded to trial where only three witnesses were called.[4]   Specific to the uncharged prior bad acts at issue here, K.B. and A.B. testified.  K.B. testified that during their time at the Third Street apartment, A.B. and Mr. Miller had a close relationship.  Mr. Miller would shower and bathe with A.B. a "[c]ouple times a week."  This continued after the family moved to Charles Avenue but "[i]t was less there."  K.B. questioned Mr. Miller about this conduct, and he said this was "[Mr. Miller's and A.B.'s] bonding time and that [it] was actually a normal way a father would teach a son how to take care of his hygiene."  K.B. testified she never had a normal childhood herself, so she believed Mr. Miller.  She also recounted that while living at Third Street, she walked in on Mr. Miller "masturbating with [A.B.] there."  K.B. immediately walked out of the house and Mr. Miller followed her.  Mr. Miller said, "It's not what it looks like. . . . That's how a father teaches a young boy to properly masturbate."  Again, K.B. said she believed him.

[¶12]   A.B. testified that he started taking baths with Mr. Miller at the Third Street apartment.  He thought it was normal because Mr. Miller told him it was normal, and Mr. Miller was the only father he knew.  During this same time, A.B. stated he and Mr. Miller would sleep in the same bed, usually naked.

[¶13]   A.B. also testified to the charged conduct.  A.B. testified the first time he and Mr. Miller had sexually intrusive contact, A.B. was lying on his bed playing with his phone.  Mr. Miller came in and closed the door.  He sat on the bed and undressed.  A.B. also undressed.  The two performed mutual fellatio for five to ten minutes followed by Mr. Miller anally penetrating A.B.  This pattern continued throughout the time they lived together and at each location, usually when his mother was not home.  A.B. said he never resisted the sexual encounters or spoke to anyone about this because he believed these behaviors were normal.  He trusted Mr. Miller and thought he was a good father.

[¶14]   The defense did not call any witnesses.  The theory of defense expressed in closing argument was that K.B. wanted to divorce Mr. Miller.  To ensure A.B. would not be able to live with Mr. Miller after a divorce, K.B. coached A.B. to make accusations of sexual abuse.

[¶15]   The jury returned a guilty verdict on all three counts.  The district court sentenced Mr. Miller to twenty-five to fifty-year terms of imprisonment on Counts I and on II, to run consecutively, and twenty-five to fifty years on Count III, concurrent to the sentences imposed on Counts I and II.

---

[4] These witnesses were K.B., A.B., and an expert witness who had not read any information about the case.  The expert witness testified only generally to the time frames in which children eventually report sexual abuse and the process of grooming.

# DISCUSSION

## I. Did the admission of W.R.E. 404(b) evidence prejudice Mr. Miller?

[¶16] Mr. Miller contends the district court erred in allowing K.B. and A.B. to testify regarding the sleeping arrangements; Mr. Miller's frequent bathing and showering with A.B.; incidents of masturbation; and Mr. Miller's explanations that his conduct with A.B. was normal. He claims this testimony was unfairly prejudicial 404(b) evidence because it did not relate directly to the first-degree sexual assault charges at trial.

## A. Standard of Review

[¶17] The admissibility of 404(b) evidence is reviewed "in two parts; first for abuse of discretion, assuming the court performed some sort of analysis under the *Gleason* [¶ 30, 57 P.3d at 343] framework."[5] *Mitchell v. State*, 2020 WY 142, ¶ 20, 476 P.3d 224, 232

---

[5] These *Gleason* factors are:
> 1. How clear is it that the defendant committed the prior bad act?
> 2. Does the defendant dispute the issue on which the state is offering the prior bad acts evidence?
> 3. Is other evidence available?
> 4. Is the evidence unnecessarily cumulative?
> 5. How much time has elapsed between the charged crime and the prior bad act?
> . . . The trial court should [then] weigh [the following] factors against the probative value of the evidence:
> 1. The reprehensible nature of the prior bad act. The more reprehensible the act, the more likely the jury will be tempted to punish the defendant for the prior act.
> 2. The sympathetic character of the alleged victim of the prior bad act. Again, the jury will be tempted to punish the defendant for the prior act if the victim was especially vulnerable.
> 3. The similarity between the charged crime and the prior bad act. The more similar the acts, the greater is the likelihood that the jury will draw the improper inference that if the defendant did it once, he probably did it again.
> 4. The comparative enormity of the charged crime and the prior bad act. When the prior act is a more serious offense than the charged crime, the introduction of that act will tend to place the defendant in a different and unfavorable light.
> 5. The comparable relevance of the prior bad act to the proper and forbidden inferences. Evidence of the prior bad act may be much more probative of bad character than it is of any legitimate inference permitted by Rule 404(b).

(Wyo. 2020) (citations omitted); *Moser v. State*, 2018 WY 12, ¶ 24, 409 P.3d 1236, 1244–45 (Wyo. 2018) ("Our task in reviewing a district court's decision on the admissibility of uncharged misconduct evidence is to determine whether the district court abused its discretion, not to apply the *Gleason/Vigil* test anew." (citations omitted)). "Second, if we find error, or if the first prong is unreviewable because no analysis occurred, our inquiry turns to whether the admission was prejudicial." *Mitchell*, ¶ 20, 476 P.3d at 232 (citations omitted).

[¶18] "[A]n error is prejudicial when 'there is a reasonable probability that the result would have been more favorable to the defendant had the error not occurred.'" *Id.* ¶ 21, 476 P.3d at 232 (quoting *Larkins v. State*, 2018 WY 122, ¶ 94, 429 P.3d 28, 49–50 (Wyo. 2018)). "[T]he touchstone of the enquiry must remain whether the . . . [error] 'undermines our confidence' that the factfinder would have reached the same result." *Larkins*, ¶ 94, 429 P.3d at 49–50 (quoting *Strickler v. Greene*, 527 U.S. 263, 300–01, 119 S.Ct. 1936, 1957–58, 144 L.Ed.2d 286 (1999) (Souter, J., concurring in part and dissenting in part)).

## B. Analysis

[¶19] Mr. Miller argues that had the trial court considered the *Gleason* factors before admitting the 404(b) evidence, the evidence would not have been admissible at trial. Mr. Miller contends the verdict would have been more favorable absent the 404(b) evidence because his conviction hinged on A.B.'s credibility and the evidence inappropriately bolstered A.B.'s testimony. The district court held a hearing on the admissibility of the 404(b) evidence, but did not conduct a *Gleason* analysis. Because it did not conduct the required analysis, we review only whether Mr. Miller was prejudiced by the admission of the 404(b) evidence.

[¶20] "Error is prejudicial if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had not been made. Prejudicial error requires reversal, while harmless error does not." *Volpi v. State*, 2018 WY 66, ¶ 33, 419 P.3d 884, 894 (Wyo. 2018) (citations omitted). "A core principle of Wyoming Rule of Evidence 404(b) 'is that the defendant in a criminal case should not be convicted because he is an unsavory person, nor because of past misdeeds, but only because of his guilt of the particular crime charged.'" *Blanchard v. State*, 2020 WY 97, ¶ 18, 468 P.3d 685, 691 (Wyo. 2020) (quoting *Vinson v. State*, 2020 WY 93, ¶ 17, 467 P.3d 1009, 1012 (Wyo. 2020) (quoting *Leyva v. State*, 2007 WY 136, ¶ 19, 165 P.3d 446, 452 (Wyo. 2007))).

---

6. Whether the prior act resulted in a conviction. The jury may be tempted to punish the defendant if they believe he escaped punishment for the prior bad act.

*LaJeunesse v. State*, 2020 WY 29, ¶¶ 10–16, 458 P.3d 1213, 1217–19 (Wyo. 2020) (quoting *Gleason*, ¶ 27, 57 P.3d at 342–43).

Our review of the record convinces us that the admission of Mr. Miller's prior conduct was not prejudicial.

[¶21]  It is true that the verdict depended primarily on whether the jury believed A.B.'s testimony.  K.B. testified to the uncharged misconduct she witnessed.  This conduct eventually led her to believe Mr. Miller was abusing A.B. and ultimately to her report of the abuse.  While a portion of A.B.'s testimony covered the uncharged conduct (grooming), the bulk of A.B.'s testimony focused on the charged conduct (sexual penetration and fellatio).  The prior uncharged conduct put the relationship between A.B. and Mr. Miller in context.  It explained why A.B. did not think the interactions between Mr. Miller and himself were wrong until he got older.

[¶22]  A.B.'s testimony was the only evidence of the charged conduct, as there were no other witnesses to the charged incidents.  A.B. testified about when and where Mr. Miller caused A.B. to perform fellatio on him and when and where Mr. Miller anally penetrated A.B.  A.B. recalled that this activity occurred about once or twice a week when he was living at the Third Street apartment.  Encounters like these continued about once or twice a week at the Charles Avenue residence.  They also occurred at the Cloud Peak apartment, where the frequency increased to as often as three times a week.  Although no one told him these sexual encounters were not normal, A.B. testified "after a few years, towards the end of it, [h]e was getting doubts of the whole thing and told [his] mom."  No evidence was presented in contravention of A.B.'s testimony.

[¶23]  After reviewing A.B.'s testimony, we conclude that even without the evidence of Mr. Miller's prior uncharged conduct, there is no reasonable probability that the jury would have reached a different conclusion absent the admission of the 404(b) evidence. The admission of the 404(b) evidence did not prejudice Mr. Miller.

## II. Did the district court abuse its discretion in concluding A.B. was competent without further consideration of evidence of taint?

[¶24]  Mr. Miller asserts the court abused its discretion when it found A.B. competent to testify without allowing him to address taint.

## A. Standard of Review

[¶25]  We review the district court's competency determination for an abuse of discretion and its underlying factual findings under our clearly erroneous standard of review. *Young v. State*, 2018 WY 53, ¶ 14, 418 P.3d 224, 227 (Wyo. 2018).  "Determining whether the trial court abused its discretion involves consideration of whether the court could reasonably conclude as it did, and whether it acted in an arbitrary and capricious manner." *Id.* (quoting *Triplett v. State*, 2017 WY 148, ¶ 23, 406 P.3d 1257, 1262 (Wyo. 2017)).  In our review,

7

> [w]e do not presume to place ourselves in the shoes of the trial court in these cases by reading a cold record. The trial court sees the witness'[s] facial expressions, hears inflections in [his] voice and watches [his] mannerisms during examination. These observations are a vital part of the ultimate ruling on competency.

*Hutchinson v. State*, 2012 WY 155, ¶¶ 5–7, 290 P.3d 174, 175–77 (Wyo. 2012) (citations omitted).

## B.     Analysis

[¶26]   At the time of the competency hearing, A.B. was sixteen years old. Previous interviews of A.B. occurred when he was thirteen to fifteen years old. "[Wyoming Rule of Evidence 601] presumes . . . 'every person is competent to be a witness except as otherwise provided in these rules.'" *Id.* ¶ 5, 290 P.3d at 176 (quoting W.R.E. 601). "[F]ew persons are inherently incapable of testifying in some manner which is potentially useful." *Larsen v. State*, 686 P.2d 583, 585 (Wyo. 1984). This includes children, as it is intelligence, not age, which is the deciding factor in determining a witness's competency to testify. *Id.* at 585–86 ("The age of the victim witness in this case [three at the time of the abuse and five at the time of trial] does not mandate a finding of incompetency.").

[¶27]   The question in determining competency is whether the witness can "understand, receive, remember and narrate impressions and is sensible to the obligations of the oath taken before testifying." *Mersereau v. State*, 2012 WY 125, ¶ 6, 286 P.3d 97, 104 (Wyo. 2012) (quoting *Simmers v. State*, 943 P.2d 1189, 1199 (Wyo. 1997)), *abrogated on other grounds by Rodriguez v. State*, 2019 WY 25, ¶¶ 28, 37, 435 P.3d 399, 407, 410 (Wyo. 2019). Wyoming uses a five-part test adopted in *Larsen*, 686 P.2d at 585, to determine a child witness's competence to testify. The district court must determine whether the child has:

> (1) an understanding of the obligation to speak the truth on the witness stand; (2) the mental capacity at the time of the occurrence concerning which [he] is to testify, to receive an accurate impression of it; (3) a memory sufficient to retain an independent recollection of the occurrence; (4) the capacity to express in words [his] memory of the occurrence; and (5) the capacity to understand simple questions about it.

*Young*, ¶ 16, 418 P.3d at 228 (quoting *Larsen*, 686 P.2d at 585).

[¶28]  The issue of taint does not have to be addressed at a separate hearing but usually can be adequately tested under the third factor of the *Larsen* test—whether the child has "a memory sufficient to retain an independent recollection of the occurrence." *Griggs v. State*, 2016 WY 16, ¶¶ 9–56, 367 P.3d 1108, 1118–28 (Wyo. 2016).  We have explained that a specific allegation of taint requires the analysis of the third competency element to be expanded, as follows:

> The factors that should be considered in assessing the reliability of a complaint regarding sexual offenses are: "(1) the age of the victim; (2) circumstances of the questioning; (3) the victim's relationship with the interrogator; and (4) the type of questions asked." * * * Undue suggestiveness can occur when an interviewer has a preconceived notion of what has happened to a child, the interviewer uses leading questions, the interviewer is a trusted authority figure, the person accused of wrongdoing is vilified during the interview, or the interviewer uses threats or rewards to pressure the child.

*Id.* ¶ 30, 367 P.3d at 1122–23 (quoting *English v. State*, 982 P.2d 139, 146 (Wyo. 1999) (citations omitted)).  "A court is not required to conduct a separate taint hearing or expand a competency inquiry to also address taint unless trial counsel either specifically requests a taint hearing or formally presents some evidence of taint prior to trial." *Shields v. State*, 2020 WY 101, ¶ 21, 468 P.3d 1097, 1104–05 (Wyo. 2020).  To the extent the use of the word "or" in *Shields* can be read to compel a taint hearing on the request of trial counsel without more, we take this opportunity to clarify that more is required.  In *Griggs*, we were clear: "[T]here must be a showing of at least 'some evidence' that the victim's statements were the product of suggestive or coercive interview techniques **before** a 'taint hearing' must be granted." *Griggs*, ¶ 30, 367 P.3d at 1123 (emphasis added) (quoting *English*, 982 P.2d at 146 (citing *State v. Michaels*, 642 A.2d 1372, 1383 (N.J. 1994))).  We clarify here that the standard in *Griggs* endures and a minimal evidentiary showing of taint is required before a hearing will be granted.

[¶29]  Prior to trial, Mr. Miller claimed A.B. was not competent to testify because improper influences and interview techniques had tainted his testimony so completely that he no longer retained an independent recollection of the events.  The district court held a competency hearing.  On appeal, Mr. Miller contends he was prevented from asking questions regarding the third factor as it related to taint during the competency hearing.  For example, he claims he tried to ask A.B. "about details concerning the manner in which he was interviewed," but the prosecutor's objections prevented "questions concerning the interview techniques used on A.B."  Our reading of the hearing transcript does not support this contention.  Rather, the transcript reveals defense counsel did not ask questions about the *manner* of A.B.'s questioning; instead, he repeatedly

attempted to question the *substance* of specific statements A.B. made in each interview. For example, defense counsel asked A.B. what he said about the charges against Mr. Miller during a given interview.

[¶30] Only one question even remotely addressed interview techniques. Defense counsel asked A.B., "did they ask you to clarify what had happened?" A.B. answered, "They might have, I think so." Defense counsel did not follow up. On cross-examination, the State asked A.B., "Has anybody – has anybody ever, regarding [the] allegations, told you that something happened to you which you thought maybe didn't happen?" A.B. responded, "No."

[¶31] The district court encouraged defense counsel to focus on independent recollection rather than the substance of A.B.'s interviews. At one point, the district court explained to defense counsel:

> [W]hat we're trying to focus on is whether or not he has a memory sufficient to retain an independent recollection of the occurrence that is alleged in this particular matter, not specifically what he said in each individual interview.
>
> .   .   .
>
> If you want to ask him specific questions about his recollection of the specific case, please do so, maybe that will establish the burden that you need to move forward in making questions about the interviews.

In response, defense counsel asked A.B. where he lived "from December 2014 to September 2015." A.B. said "it was that apartment . . . over near the canal." When asked where he was living "from September 2015 to March 2016," A.B. testified he had lived in the "house which is next to the church that says 999." When asked what his specific allegations were for that period of time, A.B. said "oral sex, and then he also did let's say anal." However, A.B. could not remember where he was living in September 2016. Defense counsel proceeded, "Because you don't recall where you were living during that time period, you can't tell what happened during that period of time; can you?" A.B. answered, "I can because as I said, I know what happened between an ordered time frame. I know what happened between two larger dates because it happened between when I moved here until 2016."

[¶32] At the conclusion of the competency hearing, Mr. Miller's counsel requested a taint hearing as to Count III based on A.B.'s inability to recall where he was living in September 2016. The following colloquy ensued:

[Court:] [W]hat's the indication that he may have been coached or tainted in regards [sic] to that particular count?

[Counsel:] [A.B.] doesn't know where he was living. Obviously if something was happening to him that recently, that he would have a memory of that, unless he was prompted and told that that was a date. . . .

[Court:] Is there any evidence or information that that in fact happened? I mean he hasn't just forgot the address since he gave that information to them?

[Counsel:] I think the indication is that he's stated all these other places that he lived and then doesn't have [specific] recollection of that particular place, I think that's significant. Do I have a lot of other information regarding that? No, I don't.

[¶33] Prior to ruling, the court again attempted to clarify the argument:

[Court:] What remedy are you asking for in regards [sic] to [Count III]?

[Counsel:] I would like to be able to do a taint hearing regarding [Count III].

[Court:] What do you think that that would entail beyond what we have already done here today?

[Counsel:] It would entail questioning specifically about . . . how he came up with what he alleged in the interview that he had with John Core and others on February 2018, as to that particular count. That if he doesn't recall anything about it, he may have been coached as to what happened on that occasion.

[Court:] Do you have any evidence to proffer that he would have been coached or if there was something improper about the particular interview relating to [Count III]?

[Counsel:] Well, probably I do if I play the interview . . . that took place with his mother and David Olney and others that were at the DFS office, but [it's] probably not worth the

11

[c]ourt's time or our time to go through that video. So no, I don't have anything else.

[¶34] The district court noted, "There hasn't been any specific evidence proffered or presented to the [c]ourt that creates the indicia of improper or coercive interview techniques being used in the interviews of the minor child in this matter . . . ." After reviewing the *Larsen* factors, the court concluded A.B. was competent to testify and denied the request for a further taint hearing.

[¶35] Defense counsel was not "barred" from presenting evidence of taint.

> [T]he focus of the pretrial hearing is on the coercive and suggesting propensity of the investigative questioning of each child and whether that questioning, examined in light of all relevant circumstances, gives rise to the substantial likelihood that the child's recollection of actual events has been irremediably distorted and the statements and the testimony concerning those events are unreliable.

*Michaels*, 642 A.2d at 1383–84.[6] "[T]here must be a showing of at least 'some evidence' that the victim's statements were the product of suggestive or coercive interview techniques **before** a 'taint hearing' must be granted." *Griggs*, ¶ 30, 367 P.3d at 1123 (emphasis added) (quoting *English*, 982 P.2d at 146 (citing *Michaels*, 642 A.2d at 1383)). "Some evidence means a quantity more than none or a scintilla, that rationally may lead to a conclusion of incompetency." *Alicea v. State*, 13 P.3d 693, 697 (Wyo. 2000) (quoting *Hatten v. State*, 978 S.W.2d 608, 611 (Tex. App. 1998), *aff'd and remanded* (Apr. 29, 1998)), *overruled on other grounds by Jones v. State*, 2019 WY 45, 439 P.3d 753 (Wyo. 2019).

[¶36] Here, the only evidence of "taint" was A.B.'s inability to recall where he lived in September 2016. "The inability to remember specific matters does not mean a witness is not competent to testify, although it may affect her credibility as a witness." *Young*, ¶ 19, 418 P.3d at 229 ("[T]he *Larsen* test 'focuses on the mental abilities of the witness rather than the witness's recollection of specific events.'" (citation omitted)); *Ryan v. State*, 988 P.2d 46, 58 (Wyo. 1999) ("That [the witness's] memory proved fallible on one point does not demonstrate the absence of an independent recollection. Her memory of the event as a whole must be considered in ascertaining whether she actually had an independent recollection of the events.").

---

[6] We adopted our analysis of the parameters of a taint hearing in *English*, following the reasoning of the New Jersey Supreme Court in *Michaels*, 642 A.2d at 1383–84 (examining the role of expert testimony in a taint hearing). *Billingsley v. State*, 2003 WY 61, ¶¶ 20–21, 69 P.3d 390, 397–98 (Wyo. 2003).

[¶37] The district court afforded Mr. Miller every opportunity to present threshold evidence of taint. No evidence of improper interview techniques, coercion, or lack of independent recollection was produced. The district court did not abuse its discretion in concluding Mr. Miller had failed to introduce sufficient evidence to prompt further investigation of taint.

## *CONCLUSION*

[¶38] The district court's admission of W.R.E. 404(b) evidence did not prejudice Mr. Miller. The district court did not abuse its discretion when it determined that no evidence of taint was produced at the hearing, and A.B. was competent to testify at trial. Affirmed.